*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0091P (6th Cir.)
File Name: 04a0091p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

JOCELYN TOMPKIN,
Administratrix with will
annexed of the Estate of
David Tompkin, deceased,
*Plaintiff-Appellant/
Cross-Appellee,*

*v.*

PHILIP MORRIS USA, INC.,
formerly known as PHILIP
MORRIS, INC.; LIGGETT
GROUP, INC.; LORILLARD
TOBACCO COMPANY; THE
AMERICAN TOBACCO
COMPANY,
*Defendants-Appellees/
Cross-Appellants.*

Nos. 02-3267/3309

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 94-01302—David D. Dowd, Jr., Senior District Judge.

Argued: September 19, 2003

Decided and Filed: March 30, 2004

2    *Tompkin v. Philip*              Nos. 02-3267/3309
     *Morris, Inc., et al.*

Before: SUHRHEINRICH, COLE, and ROGERS, Circuit
Judges.

---

## COUNSEL

**ARGUED:** A. Russell Smith, A. RUSSELL SMITH LAW
OFFICES, Akron, Ohio, for Appellant. Walter L. Cofer,
SHOOK, HARDY & BACON, Kansas City, Missouri, for
Appellees. **ON BRIEF:** A. Russell Smith, A. RUSSELL
SMITH LAW OFFICES, Akron, Ohio, for Appellant. Walter
L. Cofer, Craig Proctor, SHOOK, HARDY & BACON,
Kansas City, Missouri, Mary M. Bittence, Diane P. Chapman,
BAKER & HOSTETLER, Cleveland, Ohio, Kenneth J.
Walsh, Tyler L. Mathews, MCDONALD HOPKINS,
Cleveland, Ohio, Patrick M. McLaughlin, Colin R. Jennings,
MCLAUGHLIN & MCCAFFREY, Cleveland, Ohio, James
E. Milliman, Benjamin S. Shively, MIDDLETON &
REUTLINGER, Louisville, Kentucky, Michael J. Suffern,
DINSMORE & SHOHL, Cincinnati, Ohio, for Appellees.

---

## OPINION

---

ROGERS, Circuit Judge. Plaintiff Jocelyn Tompkin sued
the defendant tobacco companies, alleging that her husband,
David Tompkin, died as a result of smoking cigarettes sold by
the defendants.[1] Tompkin asserted statutory and common
law products liability claims. After this court reversed the

---

[1]Tompkin sued both in her individual capacity and as executrix of
her husband's estate. The original defendants were Philip Morris, Inc.,
Liggett Group, Inc., Lorillard Tobacco Company, The American Tobacco
Company, and Lorillard, Inc. Tompkin voluntarily dismissed her case
against Lorillard, Inc.

district court's grant of summary judgment in favor of the defendants, the case proceeded to trial. A jury found for the defendants, and Tompkin now appeals.

Tompkin raises three issues on appeal. Specifically, she claims that the district court erred by (1) admitting "surprise" testimony from a defense expert that there was an "association" between Mr. Tompkin's asbestos exposure and an elevated risk of lung cancer, (2) excluding certain evidence that she proffered (in particular, evidence concerning research and public-relations groups associated with the tobacco industry, evidence concerning non-party tobacco companies, evidence from prior tobacco-related proceedings, and evidence concerning the defendants' conduct after the date that her husband quit smoking), and (3) refusing to charge the jury on her "consumer expectations" claim under the Ohio Products Liability Act. Because Tompkin has not shown that she was prejudiced by any of these alleged errors, we affirm the judgment of the district court.

## BACKGROUND

*1. David Tompkin's History of Smoking and Lung Cancer*

David Tompkin began smoking in 1950, at the age of sixteen, and he quit in 1965, at the age of thirty-one. His smoking history was as follows:

| Year | Amount and Brand |
| --- | --- |
| 1950-1951 | 4 to 6 Old Gold cigarettes per day |
| 1951-1954 | 4 to 6 Philip Morris cigarettes per day |
| 1954-1957 | 6 to 8 Pall Mall cigarettes per day |
| 1957-1959 | 10 Chesterfield cigarettes per day |

| 1959-1961 | 1.5 packs of Herbert Tareyton cigarettes per day |
| --- | --- |
| 1961-1964 | Between 2 and 3 packs of Kent cigarettes per day |
| 1964-1965 | Between 2 and 3 packs of Lark cigarettes per day.[2] |

Mr. Tompkin was exposed to asbestos and other pollutants in the course of his career. After graduating from high school in 1952, he worked at Stalwart Rubber Company in the curing room. From 1953 to 1957, he worked as a bricklayer apprentice, and from 1957 to 1984, he worked as a bricklayer. In 1984, he started a construction company. During this work, he was "heavily exposed" to asbestos, and he was exposed to brick dust, cement dust, mortar, lime, and rubber-curing effluvia. Finally, Mr. Tompkin had a family history of cancer.

On June 26, 1992, Mr. Tompkin was diagnosed with lung cancer. He died on February 12, 1996, at the age of 61.

*2. Tompkin's Lawsuit and the Trial*

On June 24, 1994, Tompkin and her husband, then still alive, filed suit against the defendants in the United States District Court for the Northern District of Ohio. Tompkin was substituted for her husband, as administratrix of his estate, after his death. In her amended complaint, Tompkin asserted the following claims: (1) strict liability; (2) negligent, willful and wanton misconduct; (3) fraud and

---

[2] During the relevant time period, The American Tobacco Company made Pall Mall and Herbert Tareyton cigarettes, Liggett Group, Inc. made Lark and Chesterfield cigarettes, Lorillard Tobacco Company made Old Gold and Kent cigarettes, and Philip Morris, of course, made Philip Morris cigarettes.

misrepresentation; (4) strict liability for misrepresentation; (5) express warranty; (6) implied warranty; (7) conspiracy and concerted action; and (8) derivative claims for wrongful death and loss of consortium.

On August 3, 1998, the district court granted summary judgment in favor of the defendants. It held that Tompkin's first five claims were governed by the Ohio Product Liabilities Act ("OPLA") and that OPLA's "common knowledge" doctrine—which bars claims for damages from risks which are "common knowledge"—applied to these claims. *Tompkin v. Am. Brands, Inc.*, 10 F. Supp. 2d 895, 899-905 (N.D. Ohio 1998). It also held that OPLA preempted breach of implied warranty claims and that Tompkin failed to establish that her husband relied on any statements by the defendants, as required to sustain her fraud and conspiracy claims. *Id.* at 900, 909-10. Finally, it held that, by definition, Tompkin's derivative claims failed when the underlying claims failed. *Id.* at 911.

On July 24, 2000, this court reversed, in part, the district court's grant of summary judgment. We concluded that Tompkin had established a genuine issue of material fact on the extent of "common knowledge" of the nexus between smoking and lung cancer, and we reversed the grant of summary judgment on her OPLA claims. *Tompkin v. Am. Brands*, 219 F.3d 566, 571-75 (6th Cir. 2000). Additionally, we reversed the district court's holding that OPLA preempted Tompkin's breach of implied warranty claim. *Id.* at 576. However, we affirmed the district court's holding that OPLA preempted her negligent, willful and wanton misconduct claim. *Id.* at 575.

The trial commenced on September 25, 2001, and comprised approximately seven days of testimony. At trial, Tompkin advanced a "failure to warn" claim under OPLA, a "consumer expectations" claim under OPLA, and a breach of implied warranty claim. However, the district court refused

to instruct the jury on Tompkin's "consumer expectations" claim, reasoning that "there was no testimony" to support the claim.

At trial, Tompkin presented fourteen witnesses, including family and close friends of her husband. Tompkin and two of her daughters testified about their relationships with Mr. Tompkin and about the effect of his cancer on him and his family. Similarly, Mr. Tompkin's business partner, and long-time coworker, testified about Mr. Tompkin's work and his smoking habits. Finally, in a videotaped deposition, Mr. Tompkin testified about his history of smoking, his (lack of) awareness of the dangers of smoking, his medical history, his history of employment, and the impact of his cancer on his personal and professional life.

Tompkin also presented testimony from the physicians who treated her husband. Mr. Tompkin's family physician, his two oncologists, and his surgeon testified about the diagnosis and treatment of his lung cancer. Additionally, his oncologist opined, as the treating physician, not as an expert witness, that cigarette smoking caused Mr. Tompkin's lung cancer.

Tompkin also presented expert testimony on her "failure to warn" claim, the defendants' "common knowledge" defense, and the cause of Mr. Tompkin's cancer. Dr. Alan Blum, a professor of family medicine at the University of Alabama School of Medicine, Tuscaloosa branch, testified in support of Tompkin's failure to warn claim. A self-styled historian, he traced the history of medical literature on the connection between smoking and lung cancer. He concluded that by 1939 "the case was closed that smoking was the leading cause of lung cancer." Based on this conclusion, he opined that (1) the defendants "knew in 1939, or in the exercise of reasonable care should have known in 1939, about a risk that was associated with their cigarettes and lung cancer," and (2) the defendants "should have issued warnings or instructions in 1939 as to the risks of smoking tobacco, particularly

cigarettes, and insofar as its causing lung cancer is concerned."

Tom Smith, the director of the general social survey at the National Opinion Research Center at the University of Chicago, testified in response to the defendants' common knowledge defense. He reviewed polling conducted between 1950 and 1965 on the connection between smoking and lung cancer. In particular, he described six Gallup polls which, averaged together, showed that only 45% of the respondents believed that smoking caused lung cancer. Based on this investigation, he opined that "the ordinary person with ordinary knowledge common to the community" did not recognize "the nature and the extent of the link between smoking cigarettes and lung cancer between the years 1950 and 1965." He explained that "based on the particular data here from Gallup as well as other data we've looked at about what causes cancer and people's beliefs about what harms come from smoking, the data clearly indicates that people did not make a strong link in that period between smoking and lung cancer."

Dr. Joseph Tomashefski, a pathologist, testified about the cause of Mr. Tompkin's cancer. He testified that, in connection with the autopsy of Mr. Tompkin, he reviewed Mr. Tompkin's history of smoking and ordered an asbestos fiber burden test on tissue samples, which revealed "a high load of asbestos fibers in [Mr. Tompkin's] lungs." Based on this information, he concluded that Mr. Tompkin's cancer was "due to the combined effect of his cigarette smoking and his exposure to asbestos." He explained that "asbestos interacts with cigarette smoking by a process that we call synergy" whereby "they have an effect which is beyond an additive effect of each of their potencies." He also testified that asbestos was "a relatively weak carcinogen," and that he had never seen a case of lung cancer involving asbestos alone without any history of smoking.

Dr. David Sidransky, the Director of Head, Neck, and Cancer Research at Johns Hopkins University, also testified about the cause of Mr. Tompkin's cancer. Sidransky performed a "Loss of Heterozygosity" analysis (an "LOH" analysis) on tissue samples from Mr. Tompkin. He explained that chromosomal changes occur in cancerous cells (including the loss of chromosomal arms that contain growth suppressing genes) and that certain of these changes occur much more frequently in cancer victims who have smoked than in cancer victims who have not smoked. Applying LOH analysis, he determined that many of these chromosomal changes associated with smoking had occurred in cancer cells from Mr. Tompkin. Based on this finding, he opined that "smoking was a major contribution to [Mr. Tompkin's] lung cancer."

Finally, Dr. John Burke, a retired professor of economics, testified about Mr. Tompkin's loss of future earning capacity.

The defendants presented four witnesses, all of whom were experts. Dr. Joan Hoff, a professor of history at Ohio University, testified in support of the defendants' common knowledge defense. At the request of defense counsel, she had researched discussions of smoking and lung cancer in national magazines, regional newspapers, legislative materials, and educational materials during the period from 1950 to 1965 to determine "commonly held attitudes or common knowledge or common information available to the average person about the link between lung cancer and cigarette smoking." Based on her research, she opined that "the link between cigarette smoking and lung cancer was common knowledge" in the United States and, in particular, in Ohio between 1950 and 1965.

The remaining defense witnesses concentrated on the proximate cause issue. Dr. David Parkinson, a professor of medicine at the State University of New York at Stony Brook and Director of the Long Island Occupational and

Environmental Health Center, testified about Mr. Tompkin's exposure to various carcinogens. He asserted that a smoker can reduce his risk of lung cancer by quitting smoking, but that "asbestos is very resistant to elimination by the body, and it is not possible to cut down the risk from cumulative asbestos exposure." Based on his review of Mr. Tompkin's deposition and medical records, he opined that Mr. Tompkin was likely exposed to asbestos and other carcinogens while working in the curing department at Stallworth Rubber Company and while working as a bricklayer on certain construction sites. He further opined that "the most significant exposure that induced Mr. Tompkin's lung cancer was his asbestos exposure" and that, "because of the small amount of cigarette smoking, and the length of time that passed after he had stopped smoking," smoking was not a proximate cause of his cancer.

Dr. Edwin Bradley, a biostatistician, testified about the epidemiological association between lung cancer and Mr. Tompkin's asbestos exposure and smoking. Using data collected by the American Cancer Society, he compared the incidence of lung cancer in a "cohort" of individuals with smoking histories similar to Mr. Tompkin to the incidence of lung cancer in a "cohort" of individuals with no history of smoking. Using this same data, he also compared the incidence of lung cancer in a "cohort" of individuals with smoking histories and asbestos exposure similar to Mr. Tompkin with a "cohort" of individuals with similar asbestos exposure but who never smoked. Finally, using the same data, he compared the incidence of lung cancer in a "cohort" of individuals with smoking histories and asbestos exposure similar to Mr. Tompkin with the incidence of lung cancer in a "cohort" of individuals with no asbestos exposure.

He then calculated the "relative risk" of lung cancer from Mr. Tompkin's level of smoking and asbestos exposure, meaning the ratio of the incidence of the disease in the "cohorts" with Mr. Tompkin's smoking history and/or

asbestos exposure to the incidence of the disease in the non-smoking "cohort" and the "cohort" without asbestos exposure. Bradley explained that a relative risk of 1.0 is the baseline—there is no increased, or decreased, risk from the exposure—and that the relative risk must be at least 2.0 to support a conclusion that the exposure is "associated" with the disease. He further explained that this method of analysis establishes only a statistical "association"; it does not establish individual causation.

Bradley concluded that Mr. Tompkin's cancer was not "associated" with smoking but was "associated" with asbestos exposure. He determined that the relative risk from smoking was 1.59, and, based on this figure, he opined that Mr. Tompkin's "smoking history was not associated with an increased risk of developing lung cancer." Similarly, he determined that the relative risk of smoking to individuals with asbestos exposure was 1.56, and, based on this figure, he opined that Mr. Tompkin's smoking did not add to his risk of developing lung cancer "[a]bove that risk that he would have had from asbestos exposure alone."[3] Conversely, he determined that the relative risk from asbestos exposure was between 2.65 and 5.91,[4] and he opined that there was "an

---

[3] Bradley further testified that smoking and asbestos exposure had an "additive" effect—meaning that an individual's risk of disease is simply the sum of the risks from the respective exposures—but not a "multiplicative" or "synergistic" effect—meaning that the exposures act "together to make it worse than it would be if it was exposed to either one or the sum of the 2."

[4] He was unable to offer a precise figure because the extent of Mr. Tompkin's asbestos exposure was not known. 2.65 represented the relative risk (to non-smokers) of any asbestos exposure, as calculated by Bradley using the American Cancer Society data. 5.91 represented the relative risk of lung cancer from a level of asbestos exposure sufficient to cause asbestosis, a figure derived from a published study. Bradley testified that, because Mr. Tompkin had an asbestos fiber burden consistent with asbestosis, "his relative risk in my opinion would be

association between the exposure of the type to asbestos that Mr. Tompkin had [and] an elevated risk of developing lung cancer."

Tompkin objected to Bradley's testimony concerning the relative risk from asbestos exposure, and to the use of demonstrative exhibits in connection with this testimony, on the ground that Bradley had not disclosed this information in his expert report. The district court overruled Tompkin's objection.

Finally, Dr. Peter McCue, the chief of anatomic pathology and a professor of pathology at Thomas Jefferson University Hospital in Philadelphia, testified about his examination of tissue samples from Mr. Tompkin. He testified that he did not detect any of the normal smoking-related changes, such as damage to the bronchial epithelium, pigment-laden macrophages, and mucous lining hyperplasia, in Mr. Tompkin's pathology specimens.[5] Conversely, he testified that he did detect asbestos fibers, quartz dust, and mineral fibers, as well as asbestos-induced disease process, in the specimens. Based on this analysis, he opined that Mr. Tompkin's cancer "most likely resulted from his occupational exposure to silicates and asbestos" and that his examination revealed "no pathological or biochemical evidence . . . that showed that he had an effect from cigarette smoking."

The jury found for the defendants, and on October 9, 2001, judgment was entered in favor of the defendants. On

October 22, 2001, Tompkin moved for a new trial, arguing that the district court had erred by (1) permitting "surprise" testimony from Dr. Bradley, (2) excluding evidence concerning organizations affiliated with the tobacco industry, (3) excluding evidence concerning non-party tobacco companies, (4) excluding evidence from prior tobacco-related cases, (5) excluding evidence concerning punitive damages and failing to charge the jury on punitive damages, (6) excluding evidence concerning post-1965 activities of the defendants, and (7) failing to charge the jury on Tompkin's consumer expectations theory under OPLA.

On January 30, 2002, the district court denied Tompkin's motion for a new trial. The court concluded that it had erred by failing to sustain Tompkin's timely objections to (1) Dr. Bradley's testimony that asbestos was "associated" with Mr. Tompkin's cancer because, the court determined, the testimony directly conflicted with Dr. Bradley's statement in his expert report that "it is not possible to determine to a reasonable degree of scientific certainty which of the risk factors, smoking or asbestos exposure (or other risk factors), contributed to Mr. Tompkin's lung cancer," and (2) the introduction of exhibits—specifically, three bar graphs that illustrated Dr. Bradley's testimony concerning the relative risk of lung cancer associated with Mr. Tompkin's asbestos exposure—which were not identified in Dr. Bradley's expert report and which contained information not disclosed in the expert report. However, the court concluded that its errors did not justify a new trial, reasoning that the errors were not prejudicial as Dr. McCue's testimony "was far more devastating than Dr. Bradley's testimony." The court's memorandum opinion denying Tompkin's new trial motion did not discuss Tompkin's other arguments.

On March 1, 2002, Tompkin filed a timely notice of appeal.

---

somewhere between the 2.65 and 5.91 [sic], probably closer to the 5.91 level."

[5] Additionally, he asserted that, after 15 to 20 years of non-smoking, a former smoker's risk of lung cancer returns "almost down to baseline or down to a normal population." He also noted that P53 and K-Ras studies performed by Dr. Tomashefski, which test for genetic changes associated with smoking, were negative.

## ANALYSIS

*1. Standard of Review*

This court reviews a district court's denial of a motion for a new trial under an abuse of discretion standard. *Tobin v. Astra Pharm. Prods., Inc.*, 993 F.2d 528, 542 (6th Cir. 1993). "Abuse of discretion is defined as a definite and firm conviction that the trial court committed a clear error of judgment." *Id.* (quoting *Logan v. Dayton Hudson Corp.*, 865 F.2d 789, 790 (6th Cir. 1989)). A district court abuses its discretion when it relies on clearly erroneous findings of fact, or when it improperly applies the law or uses an erroneous legal standard. *Romstadt v. Allstate Ins. Co.*, 59 F.3d 608, 615 (6th Cir. 1995).

Moreover, a motion for a new trial will not be granted unless the moving party suffered prejudice. *Morales v. Am. Honda Motor Co., Inc.*, 151 F.3d 500, 514 (6th Cir. 1998); *Erskine v. Consol. Rail Corp.*, 814 F.2d 266, 272 (6th Cir. 1987) (holding that a new trial will not be granted on the ground that surprise evidence was admitted unless the moving party was prejudiced). "Even if a mistake has been made regarding the admission or exclusion of evidence, a new trial will not be granted unless the evidence would have caused a different outcome at trial." *Morales*, 151 F.3d at 514. "The burden of showing harmful prejudice rests on the party seeking the new trial." *Tobin*, 993 F.2d at 541; *see also Erksine*, 814 F.2d at 272 ("In order to prevail on his motion for a new trial, plaintiff must show that he was prejudiced and that failure to grant a new trial is inconsistent with substantial justice." (citation omitted)).

*2. The District Court's Admission of the "Surprise" Testimony of Dr. Bradley*

The district court did not abuse its discretion in denying Tompkin's motion for a new trial based on "surprise" testimony by Dr. Edwin Bradley, a defense expert on the causation issue. The district court properly concluded that Tompkin did not meet her burden of demonstrating prejudice from the admission of Bradley's testimony.

Tompkin argues that Bradley failed to disclose in his expert report his testimony that there was an "association" between Mr. Tompkin's level of asbestos exposure and lung cancer. In his expert report, Bradley wrote, in relevant part,

12. Epidemiology addresses whether a disease is statistically associated with an exposure in a population, not in individuals. The question of individual causation, sometimes referred to as specific causation, is beyond the domain of the science of epidemiology. Even in populations, the existence of a statistical association does not necessarily mean that two events are causally related. Epidemiology provides information relevant to reaching a conclusion regarding general association, but cannot alone prove causation in an individual.

* * *

14. Statistical associations between exposure and disease (or mortality) from epidemiologic studies are usually measure as **relative risks** ("RRs") or odds ratios ("ORs"). A relative risk is defined as the ratio of the incidence of disease (or mortality) in the exposed group to the incidence of disease (or mortality) in the unexposed group. For example, if the incidence of cancer among the exposed group is

10 in 100 and the incidence among the unexposed group is 5 in 100, then the relative risk is 2.0 (10/100 ÷ 5/100). . . .

* * *

17. I regard **relative risks below 2.0 as too weak** to support a conclusion that an exposure is associated with a disease.

* * *

33. I have performed generally accepted statistical analyses of the data in this file addressing the question of whether there is an increased risk of lung cancer in the group of males ("cohort") enrolled in [a large epidemiological study conducted by the American Cancer Society called Cancer Prevention Study II ("CPS-II")] who had quit smoking between the ages of 26 and 34, had remained abstinent for between 27 and 35 years, and had a smoking history of 17 to 48 pack-years before quitting. This smoking history is similar to that of Mr. Tompkin, who smoked between 1950 and 1965, at which time he quit.

34. . . . The comparison group consisted of males in the CPS-II study who had never smoked.

35. Based on this analysis, I will testify that I could find no statistically significant association for the CPS-II cohort described in paragraph 33 above and an increased risk of lung cancer. I will also testify that the relative risk I calculated, in addition to not being statistically significant, was less than 2.0. Consequently, an attributable risk calculation shows that more probably than not, smoking is not related to lung cancer for this cohort. Further, I will testify

that there is no statistical association between Mr. Tompkin's smoking from 1950 to 1965 and an increased risk of death from lung cancer in 1996. It is a general scientific principle that when no statistically significant association is found between an exposure and a disease, the question of causation is moot.

* * *

39. I expect to opine to a reasonable degree of scientific certainty that the epidemiological studies on asbestos exposure and cigarette smoking do not establish that the best model for describing the relative risks is multiplicative. . . .

40. I also examined the CPS-II data file to investigate the association between asbestos exposure, smoking and lung cancer.

41. I have performed generally accepted statistical analyses of the data in this file addressing the question of whether there is an increased risk of lung cancer in the group of males ("cohort") enrolled in CPS-II who indicated on the CPS-II questionnaire that they had been exposed to asbestos and had quit smoking for between 27 and 35 years. This smoking and asbestos exposure history is similar to that of Mr. Tompkin.

42. . . . The comparison cohort consisted of males in the CPS-II study who indicated on the CPS-II questionnaire that they had been exposed to asbestos, and had never smoked.

43. Based on this analysis, I will testify that I could find no statistically significant association for the CPS-II cohort described in paragraph 41 above and an

increased risk of lung cancer. I will also testify that the relative risk I calculated, in addition to not being statistically significant, was less than 2.0. Consequently, an attributable risk calculation shows that more probably than not, smoking is not related to lung cancer for this cohort. Further, I will testify that even with consideration of his asbestos exposure, there is no statistical association between Mr. Tompkin's smoking from 1950 to 1965 and an increased risk of death from lung cancer in 1996. It is a general scientific principle that when no statistically significant association is found between an exposure and a disease, the question of causation is moot.

44. Based on further analyses of the CPS-II data, I will testify that the joint risk of asbestos exposure and smoking on the development of lung cancer is best described by an additive, not multiplicative, model.

45. I will also testify that it is not possible to determine to a reasonable degree of scientific certainty which of the risk factors, smoking or asbestos exposure (or other risk factors), contributed to Mr. Tompkin's lung cancer, when the only available data are from epidemiological studies. The difficulties of disentangling the relationship among several factors while attempting to control for confounding have been recognized in the scientific community.

J.A. at 756-61 (emphasis in original).

At trial, Bradley opined that there was "an association between the exposure of the type to asbestos that Mr. Tompkin had [and] an elevated risk of developing lung cancer." J.A. at 2379. He testified that, using the data in CPS-II, he calculated the relative risk of developing lung cancer due to asbestos exposure alone—*i.e.*, he measured a

cohort of persons who never smoked but who were exposed to asbestos against a cohort of persons who never smoked and who were never exposed to asbestos—as 2.65. J.A. at 2374. He further testified that the medical literature sets the relative risk of lung cancer for patients who have asbestosis, and thus have a high level of asbestos exposure, at 5.91. J.A. at 2376. Thus, he concluded that Mr. Tompkin's relative risk of developing lung cancer from asbestos exposure was between 2.65 and 5.91; and, as a pathological exam performed by Dr. Tomashefski, one of the plaintiff's experts, revealed a fiber burden in Mr. Tompkin's lungs consistent with asbestosis, his relative risk was "probably closer to the 5.91 level." J.A. at 2375-77.

In connection with this testimony, Bradley used three exhibits, each titled "Analysis of Mr. Tompkin's Risk Profile," which illustrate his findings on Mr. Tompkin's relative risk of developing lung cancer from smoking and from asbestos exposure. The first exhibit was a bar graph depicting Mr. Tompkin's relative risk from smoking as 1.59, a figure which the graph describes as "Not Statistically Significant." J.A. at 837. The second exhibit was a bar graph depicting Mr. Tompkin's relative risk from smoking as 1.59 and his relative risk from asbestos as 2.65, figures which the graph describes as "Not Statistically Significant" and "Statistically Significant," respectively. J.A. at 838. The third exhibit was a bar graph depicting Mr. Tompkin's relative risk from smoking as 1.59, his relative risk from asbestos as 2.65, and his relative risk from asbestosis as 5.91, figures which are labeled "Not Statistically Significant" and "Statistically Significant," respectively. J.A. at 839. In the second and third exhibits, the bar representing Mr. Tompkin's relative risk from smoking is colored blue, and the bars representing his relative risk from asbestos and asbestosis are colored red. J.A. at 838-39.

During the trial, the district court overruled Tompkin's objection to Bradley's testimony concerning the relation

between Mr. Tompkin's exposure to asbestos and his lung cancer. After the verdict, the district court denied Mr. Tompkin's motion for a new trial, which motion contended, in part, that Bradley had not disclosed in his expert report his testimony that Mr. Tompkin's asbestos exposure gave him an elevated risk of developing lung cancer. In denying the motion, the district court concluded that it had erred in overruling Tompkin's objection, as the defendants had violated Federal Rule of Civil Procedure 26(a)(2)(B) by not disclosing the exhibits and the related testimony in Bradley's report. However, the court further concluded that its error was not prejudicial, given the strength of the defendants' other witnesses. Specifically, the court found

> the testimony of the defense witness, Dr. McCue, was well documented and supported by his examination of the slides of the decedent's lung tissue and also supported by the negative findings of Dr. Tomashefski as to the P53 and K-Ras genes. In the Court's view, that testimony, which followed Dr. Bradley's testimony, was far more devastating than Dr. Bradley's testimony about epidemiology associations.

J.A. at 874.

On appeal, Tompkin challenges the admission of Bradley's testimony that Mr. Tompkin's relative risk of developing cancer from asbestos exposure was between 2.65 and 5.91 and the use of the exhibits in connection with this testimony. She contends that, as the district court concluded, the defendants violated Federal Rule of Civil Procedure 26(a)(2)(B) by not disclosing this testimony and the exhibits in Bradley's expert report. She argues that this testimony was directly inconsistent with Bradley's report, which stated, among other things, that "it is not possible to determine to a reasonable degree of scientific certainty which of the risk factors, smoking or asbestos exposure (or other risk factors), contributed to Mr. Tompkin's lung cancer." J.A. at 761.

Further, she asserts that she was prejudiced by this "surprise" testimony because her counsel were unable to prepare adequately for cross-examination of Bradley and were unable to present responsive testimony, and because Bradley's testimony "dramatically bolstered defendants' theory of causation" ("essentially the only defense in the case"). Appellant's Br. at 11, 13.

The defendants counter that Bradley properly disclosed the testimony in his expert report. They note that paragraph 36 of the report states that Bradley "will testify about the epidemiological studies on asbestos exposure, cigarette smoking and lung cancer," and that paragraph 41 advised that Bradley analyzed a cohort with a smoking and asbestos history similar to that of Mr. Tompkin. J.A. at 760. They also argue that paragraph 45 is not inconsistent with Bradley's testimony, explaining that paragraph 45 simply states that an epidemiologist cannot offer an opinion as to which risk factor *caused* Mr. Tompkin's cancer, and that Bradley simply testified to a *statistical association* between Mr. Tompkin's cancer and asbestos exposure.

The defendants argue, in the alternative, that any violation of Rule 26(a) was not prejudicial. They contend that the testimony was disclosed to Tompkin during Bradley's deposition and in Bradley's reliance materials. They also contend that Tompkin's was not harmed by the admission of the testimony, given that Tompkin admitted that asbestos contributed to her husband's cancer and that two other defense experts, Drs. McCue and Parkinson, testified that asbestos was a cause of Mr. Tompkin's cancer.

Rule 26(a) of the Federal Rules of Civil Procedure requires an expert witness to provide a written reporting containing, *inter alia*, (1) "a complete statement of all opinions to be expressed and the basis and reasons therefor," and (2) "any exhibits to be used as a summary of or support for the opinions." Fed. R. Civ. P. 26(a)(2)(B). Rule 37 provides that

"[a] party that without substantial justification fails to disclose information required by Rule 26(a) . . . is not, unless such failure is harmless, permitted to use as evidence at trial . . . any witness or information not so disclosed." Fed. R. Civ. P. 37(c)(1). Rule 37 further provides that "[i]n addition to or in lieu of this sanction, the court . . . may impose other appropriate sanctions." *Id.*

Clearly, the defendants failed to comply with Federal Rule of Civil Procedure 26(a). It is true the testimony in question was arguably consistent with paragraph 45 of Bradley's report. On one reading, paragraph 45 states that it is not possible to determine from epidemiological studies whether smoking or asbestos was the *medical cause* of Mr. Tompkin's cancer, whereas, in the challenged testimony, Bradley opined that there was a *statistical association* between lung cancer and Mr. Tompkin's level of asbestos exposure. In any event, the report does not state that Bradley will testify that Mr. Tompkin had an elevated risk of developing lung cancer due to his exposure to asbestos (let alone that his relative risk was between 2.65 and 5.91), and Rule 26(a) would require such a statement.[6] Paragraphs 36 through 43, which the defendants argue disclose the testimony, merely state (1) in general terms, that Bradley will testify about the association between asbestos exposure, cigarette smoking, and lung cancer, (2) that Bradley will testify that an additive, rather than a multiplicative, model best describes the joint risk of smoking and asbestos exposure, and (3) that Bradley will testify that the relative risk of Mr. Tompkin's level of smoking to someone who has been exposed to asbestos is less than 2.0. J.A. at 760-61. None of this information alerts the reader that

---

[6] Nor does Bradley's expert report list the exhibits, as Rule 26(a) also requires. Fed. R. Civ. P. 26(a)(2)(B).

Bradley will testify about the increased risk of lung cancer from asbestos exposure.[7]

However, Tompkin has not shown that the district court's finding that she was not prejudiced by the admission of the testimony was clearly erroneous. Other defense experts testified about the connection between Mr. Tompkin's cancer and his asbestos exposure—in terms of specific causation rather than mere "associations." Dr. Parkinson, a physician specializing in occupational medicine,[8] opined that "the most significant exposure that induced Mr. Tompkin's lung cancer was his asbestos exposure over the many years he was exposed to asbestos" and that smoking was not a proximate cause of Mr. Tompkin's lung cancer. J.A. at 2297, 2306. Dr. Peter McCue, a surgical pathologist, testified that he examined tissue samples from Mr. Tompkin's lungs and found evidence of damage from exposure to asbestos and mineral fibers but no evidence of damage from smoking. J.A. at 2520-22, 2527, 2531-34. He opined that Mr. Tompkin's

---

[7] The defendants have not cited any authority supporting their argument that, by turning over materials supporting his testimony as part of his Rule 26(a)(2)(A) reliance materials (*i.e.*, the "data or other information considered by the witness in forming the opinions"), Bradley was relieved of the additional obligation under Rule 26(a)(2)(A) to provide "a complete statement of all opinions to be expressed." Nor, despite their insistence to the contrary, have the defendants identified any deposition testimony in which Bradley reveals that he will testify that Mr. Tompkin had an increased risk of developing lung cancer due to his asbestos exposure.

[8] Dr. Parkinson is a professor of medicine at the State University of New York and the director of the Long Island Occupational and Environmental Health Center. J.A. at 2278. He testified that he helped write the State of California's asbestos exposure standard, that he runs a program for union workers in the building trades who have been exposed to asbestos, and that he has "a very good working knowledge of the epidemiology of asbestos-related disease." J.A. at 2278, 2283, 2285, 2289

cancer "most likely resulted from occupational exposure to silicates and asbestos" and that smoking was not a proximate cause of Mr. Tompkin's cancer.[9]  J.A. at 2540.

Moreover, Tompkin conceded that asbestos contributed to her husband's cancer.  *See* J.A. at 1902 (testimony of plaintiff's expert, Dr. Joseph Tomashefski, a pathologist, that "asbestos interacted with the cigarette smoke as co-carcinogens to cause his lung cancer"); J.A. at 1886 (testimony of Tomashefski that Mr. Tompkin's cancer was "due to the combined effect of his cigarette smoking and his exposure to asbestos"); J.A. at 1183-84 (opening argument that "tobacco and asbestos caused [Mr. Tompkin's] lung cancer").[10]

In denying Tompkin's motion for a new trial, the district court concluded that McCue's testimony was "far more devastating than Dr. Bradley's testimony about epidemiology associations."  J.A. at 874.  We have not found anything in the record or the parties' briefs that undermines this conclusion, and we cannot say that the exclusion of the testimony "would have caused a different outcome at trial." *Morales*, 151 F.3d at 514 (citation omitted).  In sum, we do

---

[9]The experts also testified that damage to the lungs from smoking is reversible but damage from asbestos is not. J.A. at 2283, 2291-92, 2523-24.

[10]Additionally, Tompkin cross-examined Bradley about the consistency of his testimony on asbestos with his report (J.A. at 2409-17), and he raised the issue during interim argument. *See* J.A. at 2505 ("I have to take his word for it, I couldn't tell you if my life depended on it—one of 69 articles.  He doesn't raise it in his report, he doesn't say it in his deposition, he says it here.")  During closing argument, she accused the defendants of ambushing her with Bradley's testimony.  J.A. at 2793 ("[W]e come into the courtroom and, bam, up come those boards and up come this new opinion [sic] that it was asbestos.  So, I mean, the tobacco—the defendants are capable of playing pretty hard-nosed football.").

not have "a definite and firm conviction that the trial court committed a clear error of judgment." *Tobin*, 993 F.2d at 542 (citation omitted).

### 3.  *The District Court's Exclusion of Evidence Proffered by Tompkin*

#### a.  *Introduction*

Tompkin argues that the district court erred by excluding four categories of evidence:  evidence concerning research and public relations organizations affiliated with the tobacco industry; evidence concerning non-party tobacco companies; deposition testimony from other tobacco-related lawsuits; and post-1965 evidence.  However, Tompkin has not explained the relevance of any specific piece of evidence, either making a generalized assertion that a category of evidence is relevant and leaving the court to sift through hundreds of pages of documents or thousands of pages of deposition testimony in an effort to divine the relevance of particular items, or failing to identify the specific pieces of evidence excluded by the district court at all.  Moreover, Tompkin has made no effort to explain how she was prejudiced by the exclusion of the evidence.  Consequently, we cannot conclude that the district court abused its discretion in excluding the evidence or that the exclusion of the evidence was prejudicial.

This court reviews a district court's evidentiary rulings for abuse of discretion, and a district court's determination will be reversed only if the abuse of discretion caused more than harmless error. *Argentine v. United Steelworkers of Am.*, 287 F.3d 476, 486 (6th Cir. 2002); *Trepel v. Roadway Exp., Inc.*, 194 F.3d 708, 716 (6th Cir. 1999).  "Broad discretion is given to district courts in determinations of admissibility based on considerations of relevance and prejudice, and those decisions will not be lightly overturned." *United States v. Jackson-Randolph*, 282 F.3d 369, 376 (6th Cir. 2002).  As a leading treatise observes, "[c]laims of error with regard to the

admission or exclusion of evidence are prime candidates for application of the harmless error rule." 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2885 (2d ed. 1995).

As defined by the Federal Rules of Evidence, relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. All relevant evidence is admissible. Fed. R. Evid. 402. However,

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed. R. Evid. 403.

> b.  *Exclusion of Evidence Concerning Tobacco Industry Groups*

Tompkin contends that the district court erred by excluding evidence concerning certain research and public relations groups affiliated with the tobacco industry. However, Tompkin has not shown that any specific document was relevant or that the exclusion of any specific document resulted in prejudice.

On August 2, 2001, the district court entered an order "tentatively" granting the defendants' motion *in limine* to exclude evidence or allegations concerning the Council for Tobacco Research ("CTR"), the Tobacco Industry Research Committee ("TIRC"), the Tobacco Institute, Inc. ("TI"), and

Hill & Knowlton ("H & K").[11] On September 21, 2001, after considering additional briefing by the parties, the district court refused to overrule its original ruling. The district court did not explain its rationale for excluding the evidence in either order. On December 20, 2001, the district court denied Tompkin's motion for a new trial without discussing Tompkin's argument that it had erred by excluding evidence concerning the tobacco industry groups.

On appeal, Tompkin asserts, in broad terms, that evidence concerning CTR, TIRC, TI, and H & K was relevant. Specifically, she contends that "the efforts of these groups are highly relevant to the issues of common knowledge, as well as to consumer expectations, failure to warn, and punitive damages," apparently because these groups allegedly attempted to mislead the public about the dangers of cigarette smoking. She points to eighty-four documents—including internal memoranda concerning the formation of, and the activities of, TIRC and TI, press releases by TIRC, TI, and newsletters published by TI—as examples of evidence

---

[11]According to Tompkin, defendants The American Tobacco Co., Lorillard Tobacco Co., and Philip Morris, Inc., as well as other tobacco companies, formed TIRC in December 1953 in response to medical research that linked cigarette smoking to lung cancer. Tompkin alleges that TIRC, and its successor, CTR, "claimed to be independently scientifically investigating whether there were health risks to smoking cigarettes" and "continued to claim that further research needed to be done before smoking could be said to cause lung cancer . . . long after the tobacco companies internally understood the true hazards." Appellant's Br. at 18.

Also according to Tompkin, the defendants, as well as other tobacco companies, formed TI in 1958 to serve as the industry's "public relations and lobbying arm." Tompkin alleges that TI endeavored to "create a 'controversy' about the health hazards of smoking cigarettes, and to create doubt about the link between smoking and cancer without expressly denying it." *Id.*

Finally, according to Tompkin, H & K, a public relations firm, was involved in the formation of TIRC.

wrongfully excluded by the district court's ruling. However, she does not explain how any specific piece of evidence was relevant or how the exclusion of any specific piece of evidence inflicted prejudice.

Tompkin has not shown that she was prejudiced by the district court's ruling. Before this court, Tompkin merely asserts that this category of documents is relevant to an array of issues, making no effort to demonstrate the relevance of particular documents or to explain how she was prejudiced by the exclusion of particular documents. Without such information, we cannot say that the trial court committed a clear error of judgment or that Tompkin suffered prejudice.[12]

### c. *Exclusion of Evidence Concerning Non-Party Tobacco Companies*

The district court's exclusion of evidence concerning non-party tobacco companies does not constitute grounds for a new trial, as Tompkin has not demonstrated that the district court improperly excluded any specific piece of evidence or that the exclusion of any specific piece of evidence was prejudicial.

On August 2, 2001, the district court entered an order "tentatively" granting the defendants' motion *in limine* to

---

[12]Moreover, although the district court granted the defendants' motion *in limine* to exclude this category of evidence, it later ruled that the defendants had "opened the door" to this evidence. During Tompkin's cross-examination of Dr. Hoff, the defendants' expert on the common knowledge issue, the district court ruled that evidence relating to TIRC and TI was no longer excluded, given that Dr. Hoff had shown "no interest" in the public position of the tobacco companies regarding the link between cigarette smoking and lung cancer when analyzing whether the linkage was common knowledge. J.A. at 1618. Tompkin proceeded to question Dr. Hoff about TIRC, TI, CTR, and H & K, even examining Dr. Hoff about one of the press releases that Tompkin complains was excluded by the district court's initial ruling. J.A. at 1619-51.

exclude evidence of or reference to conduct or documents of non-party tobacco companies. On September 21, 2001, after considering additional briefing by the parties, the district court refused to overrule its original ruling. The district court did not explain its rationale for excluding the evidence in either order. On December 20, 2001, the district court denied Tompkin's motion for a new trial without discussing Tompkin's argument that it had erred by excluding evidencing concerning non-party tobacco companies.

On appeal, Tompkin argues that the district court erred by excluding evidence concerning non-party tobacco companies. Speaking in the most general terms, she contends that this evidence was relevant because evidence showing that other tobacco companies knew of the dangers of smoking indicates that the defendants should have known of the dangers as well (and, hence, should have warned consumers of the dangers). She has not identified any specific piece of evidence that was excluded by the district court's ruling.

Given Tompkin's failure to direct the court to the specific pieces of evidence that she was prevented from introducing, we cannot say that the district court committed reversible error. It is impossible to determine whether the evidence that Tompkin intended to present was relevant (or whether the evidence should have been excluded under Federal Rule of Evidence 403) without knowledge of the substance of the testimony or documents. Likewise, it is impossible to say that Tompkin was prejudiced by the exclusion of the evidence simply on the basis of Tompkin's generalized assertion that the evidence was "relevant."

### d. Exclusion of Deposition Testimony from Other Proceedings

The district court's exclusion of deposition testimony from other proceedings does not constitute reversible error, as Tompkin has not established that she was prejudiced by the exclusion of the testimony.

On appeal, Tompkin complains that she was not allowed to present the following deposition testimony:[13] (1) testimony from Robert Heimann, the former president and CEO of The American Tobacco Company, "regarding warnings" (Appellant's Reply Br. at 30); (2) testimony from Frederick Panzer, an employee of TI starting in 1969, that the tobacco industry had employed "a holding strategy" of "creating doubt about the health charge without actually denying it" and "advocating the public's right to smoke, without actually urging them to take up the practice" (*id.* at 32); (3) testimony from Bennett LeBow, who acquired ownership of Liggett Group, Inc. in the 1980s, that "the tobacco companies were all lying regarding the defenses they were making including cigarettes causing disease" (*id.* at 33); (4) testimony from Irwin Tucker, an employee of a non-party tobacco company, that, at the December 1953 meeting where tobacco company presidents created TIRC to respond to adverse publicity from medical research linking smoking to lung cancer, there was no discussion whether the tobacco companies should issue warnings to smokers regarding the health risks (*id.* at 35-36); (5) testimony from Joseph F. Cullman, the former CEO of Philip Morris, Inc., that his company took the position that "it had not been proved that cigarette smoking caused lung cancer" and that the tobacco industry endeavored "to point out to the public a controversy about smoking and health concerns" (*id.* at 39); (6) testimony from Alexander White

---

[13]The depositions were taken in various other tobacco-related lawsuits.

Spears, III, the former chairman and CEO of Lorillard Tobacco Co., that his company "would have kept selling cigarettes as long as they were a legal product, regardless of whether there were several definitive studies showing smoking causes lung cancer" (*id.* at 40); (7) testimony from Carl G. Thompson, a former employee of H & K, that "TI's position with respect to tobacco and health was basically a theme of 'scientific controversy'" (*id.* at 42); (8) testimony from William Kloepfer, an employee of TI starting in 1967, about "the use of the 'cigarette controversy' since at least TI's inception in 1958" (*id.* at 43); and (9) testimony from Walker P. Merryman, a spokesman for TI, that one of TI's purposes was to convince the public that "we are vitally interested in getting the facts that would provide answers to questions about smoking and health." *Id.* at 44.

Assuming that this testimony was relevant (and not excludable under Federal Rule of Evidence 403),[14] and also assuming that the testimony was not inadmissible hearsay,[15]

---

[14]The relevance of the excluded testimony is by no means clear. Tompkin makes no effort to tie the testimony of particular individuals to specific issues; instead, she simply announces at the outset of her argument that "[t]his testimony was relevant to the issues before the jury in this case." Appellant's Br. at 24. (There is an exception; she does assert that "portions" of Heimann's deposition relate to her failure to warn claim and the defendant's common knowledge defense. Appellant's Reply Br. at 29-30.) Moreover, she has not identified the specific testimony that she alleges was erroneously excluded. Thus, the court has been left to review literally thousands of pages of deposition transcripts and to speculate which testimony purportedly relates to which issue(s), even before turning to the relevancy and Rule 403 issues.

[15]Tompkin's responses to the defendants' hearsay objections are, at times, barely even supported. For example, she asserts that certain testimony is admissible pursuant to Federal Rule of Evidence 804(b)(1), but does not direct the court to any evidence in the record supporting her position that the declarant is "unavailable" or her position that the defendants had "an opportunity and similar motive to develop the

Tompkin has not shown that she was prejudiced by the exclusion of this testimony. She has not identified the specific testimony that she believes was erroneously excluded, has not matched the testimony of specific individuals to specific issues, and has not made any attempt to explain how her case was prejudiced by the exclusion of the testimony. Accordingly, we cannot conclude that the evidence would have caused a different outcome at trial. *In re Air Crash Disaster*, 86 F.3d 498, 526 (6th Cir. 1996).[16]

### e. Exclusion of Post-1965 Evidence

The district court's exclusion of post-1965 evidence does not constitute reversible error, as Tompkin has not shown that she was prejudiced by the exclusion of the evidence.

On April 19, 2001, the district court entered an order granting, in part, the defendants' motion to exclude post-1965 evidence. It interpreted this court's prior ruling to endorse the use of post-1965 evidence in support of Tompkin's argument that there was no "common knowledge" in 1965 of a direct link between cigarette smoking and lung cancer. However, it ruled that any post-1965 evidence must relate to the "common knowledge" issue, and it specifically ruled that post-1965 evidence was not relevant to the issue of punitive damages. On August 2, 2001, the district court denied Tompkin's motion to reconsider its April 19 ruling. On December 20, 2001, the district court denied Tompkin's motion for a new

---

testimony." *See* Appellant's Reply Br. at 44 (asserting, without supporting citation, that Merryman has cancer and is too ill to travel); *id.* at 42 (stating only that Thompson's deposition "was taken in a case involving some of the defendants in this case"); s*ee also id.* at 43 (failing to address the hearsay objection to Kloepfer's testimony).

[16] Additionally, it appears that Tompkin did not proffer any deposition testimony from Cullman, Spears, Kloepfer, or Merryman, thus waiving any right of appeal. *See* Fed. R. Evid. 103(a)(2).

trial without discussing Tompkin's argument that it had erred by excluding post-1965 evidence.

On appeal, Tompkin rests on bald argument. Her discussion of this issue follows:

> Post 1965 evidence is relevant and should not have been excluded since the factors to be considered in determining punitive damages as set forth above included a number of items which necessarily involve post injury activity. Defendants engaged in a continuing course of deceitful conduct throughout the period Mr. Tompkin smoked and for many years thereafter. Evidence regarding events subsequent to 1965 will explain defendants' motives, intent and knowledge prior to 1966. This relates to plaintiff's failure to warn and consumer expectation claims. And evidence of defendants' post 1965 routine practices of distorting the health risks of smoking is relevant and admissible under Evid. R. 406.

Appellant's Br. at 27-28.

With only this information before us, we are unable to say that the district court abused its discretion in excluding post-1965 evidence. To the extent that the evidence relates to punitive damages, any error was harmless as the jury did not reach the issue of damages. *See Miller v. Caterpillar Tractor Co.*, 697 F.2d 141, 145 (6th Cir. 1983) (holding that any error in the admission of evidence relating to damages was harmless as "the jury never reached the issue of damages and therefore the testimony could not have contributed to its verdict of no cause of action"). To the extent that the evidence relates to her failure to warn and consumer expectations claims, Tompkin has not identified the excluded evidence nor explained how the evidence would have illuminated the defendants' "motive, intent and knowledge

prior to 1966."[17]   We therefore cannot conclude that the district court erred, much less that any error caused prejudice.

#### 4.   *The District Court's Refusal to Instruct the Jury on Tompkin's Consumer Expectations Theory*

The district court's refusal to instruct the jury on Tompkin's consumer expectations theory does not constitute grounds for a new trial, as any error was harmless, given that the district court did instruct the jury on a "virtually indistinguishable" claim.

This court reviews a district court's refusal to give a requested jury instruction under an abuse of discretion standard. *Hisrich v. Volvo Cars of N. Am., Inc.*, 226 F.3d 445, 449 (6th Cir. 2000). A district court's refusal to give a jury instruction constitutes reversible error if (1) the omitted instruction is a correct statement of the law, (2) the instruction is not substantially covered by other delivered charges, and (3) the failure to give the instruction impairs the requesting party's theory of the case. *Id.* "A judgment may be reversed only if the instructions, viewed as a whole, were confusing, misleading, or prejudicial." *Id.* (quoting *Beard v. Norwegian Caribbean Lines*, 900 F.2d 71, 72-73 (6th Cir. 1990)).

Under OPLA, a product is defective in design if "[i]t is more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner." Ohio Rev. Code Ann. § 2307.75(A)(2) (Anderson 2001). Under this "consumer expectations" test, a product may be proven to be in a defective condition if (1) it is more

---

[17]Tompkin does identify two pieces of evidence in her reply brief. Tompkin sought to introduce deposition testimony from prior proceedings from Frederick Panzer, a former employee of TI, and from Bennett LeBow, the owner of Liggett Group, Inc. However, as discussed *supra* in Section 3(d), the exclusion of this testimony does not constitute grounds for a new trial.

dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, (2) the claimed defect was present when the product left the manufacturer, and (3) the claimed defect proximately caused the claimed injuries. *Hisrich*, 226 F.3d at 455. "'[E]vidence of unsafe, unexpected product performance is sufficient to infer the existence of a product defect' under the first prong of the consumer-expectation standard." *Id.* (quoting *State Farm Fire & Cas. v. Chrysler Corp.*, 523 N.E.2d 489, 494-95 (Ohio 1988)). "[T]he determination of whether a product is more dangerous than an ordinary person would expect is generally a question of fact which does not require expert testimony." *Id.* (quoting *Fisher v. Ford Motor Co.*, 13 F. Supp. 2d 631, 638 n.10 (N.D. Ohio 1998)).

The district court refused to instruct the jury on Tompkin's consumer expectations theory, finding that "there was no testimony" to support this claim. J.A. at 2629. Evidently, it accepted the defendants' argument that Dr. Smith's testimony, which Tompkin claimed created a jury issue as to the consumer expectations theory, addressed only the common knowledge issue. J.A. at 2624, 2629.

Even assuming for the sake of argument that Tompkin created a triable issue as to her consumer expectations theory, the district court's refusal to instruct the jury on this claim was harmless error. The district court did instruct the jury on Tompkin's breach of implied warranty claim, a cause of action that is "virtually indistinguishable" from a design defect claim under OPLA. *Tompkin*, 219 F.3d at 576 (quoting *Temple v. Wean United, Inc.*, 364 N.E.2d 267, 270 (Ohio 1977)); *see also White v. DePuy, Inc.*, 718 N.E.2d 450, 454 (Ohio Ct. App. 1998) (observing that "the two theories have been used interchangeably and analyzed together" (internal quotation omitted)). At least under the present facts, the elements of a consumer expectations claim and a breach

of implied warranty claim are materially indistinguishable,[18] and the district court's instruction on Tompkin's breach of implied warranty claim paralleled the pattern instruction for a consumer expectations claim.[19]   Consequently, we cannot

---

[18]The elements of a breach of implied warranty claim are (1) the existence of a defect in the product manufactured and sold by the defendant, (2) the defect existed when the product left the hands of the defendant, and (3) the defect was the direct and proximate cause of the plaintiff's injuries. *White v. DePuy, Inc.*, 718 N.E.2d 450, 455-56 (Ohio Ct. App. 1998). A product is defective if it is "dangerous to an extent beyond the expectations of an ordinary consumer when used in an intended or reasonably foreseeable manner." *Leichtamer v. Am. Motors Corp.*, 424 N.E.2d 568, 577 (Ohio 1981); *see also White*, 718 N.E.2d at 456 ("A defect is considered to exist in a product that is not of good merchantable quality, fit and safe for its ordinary intended use" (internal punctuation and quotation omitted)).   The elements of a consumer expectations claim are (1) the product is more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, (2) the claimed defect was present when the product left the manufacturer, and (3) the claimed defect proximately caused the claimed injury. *Hisrich v. Volvo Cars of N. Am., Inc.*, 226 F.3d 445, 455 (6th Cir. 2000) (citing *Leichtamer*).

[19]The district court instructed the jury that in order to find the defendants liable on the implied warranty claim, it had to find

> One, the defendant sold its cigarettes in a defective condition that made them unreasonably dangerous to Mr. Tompkin; and two, the [defendant] engaged in the business of selling the cigarettes; three, the cigarettes were expected to and did reach Mr. Tompkin without substantial change in the condition in which they were sold; and four, the defect was a direct and proximate cause of Mr. Tompkin's injuries.

> And I should also add and death [sic].

> For purposes of this claim, a product is not unreasonably dangerous unless it is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases them, with the ordinary knowledge common to the community as to their characteristics.

---

conclude that the district court's refusal to instruct the jury on the consumer expectations claim resulted in prejudice.

5.   *The Defendants' Cross-Appeal*

Given our disposition of Tompkin's appeal, the defendants' cross-appeal is moot.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

---

J.A. at 2680.  The Ohio pattern jury instructions provide as follows:

> CONSUMER EXPECTATION TEST.  A product is defective under the consumer expectation test if the product is more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.  Foreseeable uses of a product include those that might reasonably be expected, but not all uses which could occur.  You should decide whether the claimant's injury occurred as a direct result of using the product in a manner that was intended or reasonably foreseeable.  If it was not so used, than the claimant has failed to prove the existence of a defect under the consumer expectation test.  If the product was so used and was more dangerous than an ordinary consumer would expect, then the claimant has proved the existence of a defect under the consumer expectation test.

3 Ohio Jury Instructions § 351.09(2)(C) (2002).