**NOT RECOMMENDED FOR FULL TEXT PUBLICATION**
File Name: 09a0383n.06

**No. 08-1078**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| CHARLES ARDINGO, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE UNITED STATES |
| v. | ) | DISTRICT COURT FOR THE WESTERN |
| | ) | DISTRICT OF MICHIGAN |
| | ) | |
| LOCAL 951, UNITED FOOD AND | ) | |
| COMMERCIAL WORKERS UNION, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

**FILED**
**May 29, 2009**
LEONARD GREEN, Clerk

Before: **KENNEDY** and **BATCHELDER**, Circuit Judges; and **THAPAR**, District Judge.[*]

**THAPAR, District Judge.** Plaintiff Charles Ardingo won a jury verdict of $819,614 in his wrongful-termination lawsuit against Defendant Local 951, United Food & Commercial Workers Union. On appeal, the defendant contends that the judgment in favor of Ardingo should be reversed because Ardingo's wrongful-termination claim is preempted by the Labor-Management Reporting and Disclosure Act of 1959 (the "LMRDA"). In the alternative, the defendant asks for a new trial on the grounds that: (1) the trial court made several prejudicial evidentiary errors; (2) the trial court erred in refusing to give certain jury instructions proposed by the defendant; (3) the trial court erroneously permitted the plaintiff's expert to testify; and (4) the trial court erred in not remitting the

_____

[*]The Honorable Amul R. Thapar, United States District Judge for the Eastern District of Kentucky, sitting by designation.

amount of damages awarded to Ardingo. Because these arguments are unavailing, we affirm.

## I. Background

The defendant is a labor organization representing thousands of grocery store workers—largely Meijer employees—in Michigan. The defendant hired Ardingo as a business agent in 1990 under a just-cause employment policy that permitted the defendant to terminate him only if he "failed to meet employment performance standards," or if his termination would further the needs of the union "as construed by the Supreme Court in *Finnegan v. Leu* and its progeny." J.A. at 440, 590-91.[1]

Ardingo's employment with the defendant went well for the first decade. During this time, he gained a seat on the union's executive board, *id.* at 598, and was given important assignments, like negotiating critical contracts with major employers. *See id.* at 592-93.

In 2001, however, his relationship with the union leaders changed for the worse. *See id.* at 596. After rumors started circulating that Ardingo was going to run a campaign against Robert Potter, the union's president, in the next election cycle, Potter and other union officials accused Ardingo of being a traitor. *See id.* at 596-99. Ardingo requested a meeting with Potter to discuss these issues, and the two met at a union office in Livonia, Michigan. *See id.* at 600. The meeting became heated, and Potter insinuated that Ardingo was a "pipeline to the Department of Labor." *Id.* at 602. Shortly thereafter, Ardingo was reassigned to a different position and told to have no contact with members of Local 951. *See id.* at 32.

In the spring of 2002, Ardingo cooperated with a Department of Labor investigation

---

[1]*Finnegan v. Leu*, 456 U.S. 431 (1982) is a Supreme Court case that discusses, in dictum, the need for unions to be able to terminate employees for political reasons. This case figures prominently in the defendant's preemption argument and is discussed at length below.

concerning financial irregularities with the defendant. *See id.* at 608, 619-20. Shortly after participating in interviews with the Department of Labor, Ardingo testified before a grand jury concerning the same issues. *See id.* at 32, 620.

Starting in early 2003, Ardingo was reassigned in rapid succession to jobs in North Carolina, Indiana, and Washington state. *See id.* at 32, 603-04. The ostensible purpose of each of these temporary assignments was to assist in union organizing campaigns in those states. Ardingo, however, claims that these assignments were a form of retaliation for his cooperation with the Government.

By the beginning of 2004, Local 951 was experiencing financial hardship due to the loss of members. It had lost a total of $1,282,709 over the previous two years, and it was on its way to losing $950,360 during 2004. *Id.* at 447. This was a significant amount of money for an organization that had an average annual income around $10,000,000. *See id.* As a result, the union leadership decided to pare down the number of its employees. Ardingo—who was making nearly $100,000 per year at that time and had less seniority than other similarly situated individuals—was chosen to be one of ten employees who were released in January of 2004. Robert Potter testified that Ardingo was selected for termination because of economic reasons and because Potter had lost confidence in Ardingo due to the fact that Ardingo had sought employment with Meijer, the largest employer of Local 951's members. *See id.* at 994-95.

Ardingo was told that he was being released for financial reasons, but he believed that excuse to be a ruse for retaliation since the defendant had recently hired at least one additional employee. *See id.* at 623. Therefore, on December 13, 2004, Ardingo filed this lawsuit against Potter and the union, alleging that they had: (1) violated his rights under the LMRDA, (2) forced him to pay

assessments to the union in violation of the LMRDA, (3) terminated him in violation of Michigan public policy, and (4) wrongfully discharged him in violation of the union's just-cause policy. *See id.* at 23-24. Judge Richard Alan Enslen granted summary judgment in favor of the defendants on all but the wrongful-discharge claim, *see id.* at 318-29, and Potter was dismissed as a defendant shortly before the trial commenced. Thus, the only claim left for trial was the wrongful-discharge claim against the union. The parties consented to have this claim tried by Magistrate Judge Ellen S. Carmody.

On July 6, 2007, three days before the trial began, Ardingo supplemented his previous expert disclosures by submitting to the defendant an updated report from Dr. Marvin DeVries, the expert who ultimately testified about the financial damages that Ardingo had suffered. The defendant filed a motion in limine to exclude this supplemental report, and the trial court granted that motion. *Id.* at 527-28.

The trial began on July 9, 2007, and lasted for five days. In his opening statement, Ardingo's counsel told the jury that the evidence would show that Ardingo was not terminated for just cause. The defendant's counsel, on the other hand, told the jury that the evidence would show that Ardingo was terminated out of economic necessity, which amounted to just cause. *See id.* at 569. Following the opening arguments, Ardingo proceeded to present evidence showing that he had been terminated not out of economic necessity, but out of retaliation for his cooperation with the Government and his testimony before a grand jury. Conversely, the defendant introduced evidence to support its theory that Ardingo had been terminated because of economic necessity. *See id.* at 666-67, 978-92. Particularly, the defendant argued that its shrinking membership required it to cut costs by reducing the number of its employees. The defendant maintained its economic-necessity theory all the way

4

through to the closing arguments. *See, e.g., id.* at 1194. The jury, however, apparently did not buy into the defendant's theory and therefore returned a verdict in favor of Ardingo.

The judgment in favor of Ardingo is now on appeal before this court. In particular, the defendant argues that the judgment should be reversed because Ardingo's claim is preempted by the LMRDA, and in the alternative, the defendant argues that the judgment should be reversed because the trial court erred by: (1) admitting evidence pertaining to the alleged retaliation against Ardingo; (2) rejecting the defendant's proposed jury instructions with respect to the significance of *Finnegan v. Leu*, the burden of proof in wrongful-discharge cases, and the possibility of reinstatement in lieu of front-pay damages; (3) permitting Ardingo's expert to testify; and (4) refusing to remit the jury verdict.

## II. LMRDA Preemption

A federal law may preempt a state law cause of action either expressly or impliedly. *See State Farm Bank v. Reardon*, 539 F.3d 336, 341 (6th Cir. 2008) (citing *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 152-53 (1982)). A state law cause of action will be expressly preempted where a federal statute or regulation contains express language indicating that such lawsuits are preempted. *See id.* at 341-42 (citing *Fidelity Fed. Sav. & Loan Ass'n*, 458 U.S. at 153). Implied preemption, on the other hand, exists where there is either "field preemption" or "conflict preemption." *Id.* at 342 (citing *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992)). Field preemption is found "where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *Id.* (quoting *Gade*, 505 U.S. at 98). Conflict preemption refers to situations "where compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the

5

accomplishment and execution of the full purposes and objectives of Congress." *Id.* (quoting *Gade*, 505 U.S. at 98). None of these types of preemption, however, apply to Ardingo's wrongful-discharge claim. This is not surprising considering that the Sixth Circuit has previously stated that "the preemptive scope of the LMRDA is narrow." *Davis v. UAW*, 392 F.3d 834, 839 (6th Cir. 2004), *overruled on other grounds by Blackburn v. Oaktree Cap. Mgmt., LLC*, 511 F.3d 633 (6th Cir. 2008).

First, Ardingo's claim is not expressly preempted because 29 U.S.C. § 483, the express preemption provision in the LMRDA, does not apply to state-law wrongful-discharge claims. Instead, it only applies to state-law challenges to union elections. *Id.* As Ardingo's claim is clearly not a state-law challenge to a union election, it does not succumb to express preemption.

Nor does Ardingo's claim fall prey to field preemption. It is true that LMRDA regulates relationships between union leaders and their subordinates by preventing rank-and-file union members from being disciplined for exercising certain rights such as the right to vote in union elections and the right to speak and assemble. *See Finnegan v. Leu*, 456 U.S. 431, 436-37 (1982). However, the LMRDA clearly does not occupy the entire field of regulation with respect to union employees because it contains a savings clause that provides that "except as explicitly provided to the contrary, nothing in this chapter shall take away any right or bar any remedy to which members of a labor organization are entitled under such other Federal law or the law of any State." 29 U.S.C. § 523(a). Thus, the savings clause makes it clear that the LMRDA does not occupy the field of regulation with respect to the relationships between union leaders and subordinates so thoroughly that union employees cannot enter into and enforce just-cause employment contracts under state law.

Furthermore, there is no conflict preemption here because it is not physically impossible to

6

comply simultaneously with both the LMRDA and the state law pertaining to wrongful discharge. The LMRDA restricts union officials from retaliating against union members for exercising political rights such as their right to free speech. It is not physically impossible to comply with these restrictions while simultaneously complying with state wrongful-discharge law. Moreover, there is no conflict preemption because Ardingo's lawsuit does not pose an obstacle to the LMRDA's purposes and objectives. The LMRDA's "overriding objective was to ensure that unions would be democratically governed, and responsive to the will of the union membership as expressed in open, periodic elections." *Finnegan*, 456 U.S. at 441 (citing *Wirtz v. Hotel Employees*, 391 U.S. 492, 497 (1968)). There is no danger that this objective will be interfered with by a lawsuit that seeks to vindicate an employee's rights under a just-cause employment contract.

The defendant, however, suggests that conflict preemption does apply in this instance. According to the defendant, the Supreme Court's decision in *Finnegan* construed the LMRDA in a way that requires a finding of preemption in this case. Essentially, the defendant argues that the LMRDA, as interpreted in *Finnegan*, provides union officials with an affirmative right to exercise unfettered discretion in union employment matters. The defendant's reliance on *Finnegan*, however, suffers from two fatal defects. First, *Finnegan* is inapposite to the case at hand. Second, the defendant misinterprets *Finnegan*. To see why this is so, it will be helpful to review *Finnegan*.

The petitioners in *Finnegan* were union members who—just like the plaintiff in this case—had been employed by their union as business agents. *Id.* at 433. Unlike the plaintiff in this case, however, the petitioners in *Finnegan* were not suing for wrongful discharge in violation of a just-cause employment contract. Instead, each of the petitioners was claiming that his termination was a violation of the LMRDA. *Id.* at 434. The *Finnegan* petitioners' claims arose out of an

7

election for the presidency of Local 20 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America. *See id.* at 433-34. After the election, the newly elected president fired the petitioners because they had supported his opponent. *See id.* The petitioners then sued the new president on the ground that he had violated their rights under the LMRDA. *See id.* at 434. The question presented to the Supreme Court was "whether the discharge of a union's appointed business agents by the union president, following his election over the candidate supported by the business agents, violated the Labor-Management Reporting and Disclosure Act of 1959." *Id.* at 432.

In addressing that question, the Supreme Court first engaged in a discussion of the background and purposes of the LMRDA. The Court observed that the statute "was the product of congressional concern with widespread abuses of power by union leadership," *id.* at 435, and the Court further noted that the statute was intended to ensure "that unions would be democratically governed and responsive to the will of their memberships." *Id.* at 436. To this end, the LMRDA granted rights to union members "paralleling certain rights guaranteed by the Federal Constitution." *Id.* Specifically, the LMRDA sought to ensure that union members would be able to exercise their rights "to freedom of expression without fear of sanctions by the union, which in many instances could mean loss of union membership and in turn loss of livelihood." *Id.* at 435-36. Against this backdrop, the Supreme Court concluded that the LMRDA was intended to protect "rank-and-file union members—not union officers or employees." *Id.* at 437. Thus, it was clear that the LMRDA would have protected the petitioners if they had been punished in their capacity as union members. However, they were not punished in that capacity. Instead, the union president only exacted retribution against them in their capacity as union employees.

After discussing the background of the LMRDA, the Court turned its attention to the question of whether the LMRDA protected the petitioners from political retribution in their capacities as union employees as well as in their capacities as union members. First, the Court rejected the petitioners' claims that the union president's actions violated § 609 of the LMRDA (codified at 29 U.S.C. § 529), which makes it unlawful for a union officer to "fine, suspend, expel or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of [the LMRDA]." According to the petitioners, their termination as business agents was an act of discipline that violated § 609. The Supreme Court, however, concluded that § 609 did not provide the petitioners with a cause of action because § 609 only applies to "punitive actions diminishing membership rights, and not to termination of a member's status as an appointed union employee." *Finnegan*, 456 U.S. at 438. Next, the Court rejected the petitioners' attempts to establish a cause of action under § 102 of the LMRDA (codified at 29 U.S.C. § 412), which allows a person to sue in a district court of the United States if that person's rights under the LMRDA have been infringed. The Court held that the petitioners could not sue under § 102 because their rights under the LMRDA had not been infringed. *See Finnegan*, 456 U.S. at 440-42. In particular, the Court stated that:

> [The LMRDA] does not restrict the freedom of an elected union leader to choose a staff whose views are compatible with his own. Indeed, neither the language nor the legislative history of the Act suggests that it was intended even to address the issue of union patronage. To the contrary, the Act's overriding objective was to ensure that unions would be democratically governed, and responsive to the will of the union membership as expressed in open, periodic elections. Far from being inconsistent with this purpose, the ability of an elected union president to select his own administrators is an integral part of ensuring a union administration's responsiveness to the mandate of the union election.

*Id.* at 441 (citation and footnotes omitted). Therefore, the Supreme Court affirmed the summary judgment that had been entered in favor of the union. *See id.* at 442. Considering that the Court had

9

already found that the statute was intended to protect union members instead of union employees, it is not surprising that the Court held that the LMRDA provided no protection for the petitioners.

The most glaringly obvious defect in the defendant's reliance on *Finnegan* is that *Finnegan* is inapposite to the case at hand. *Finnegan* simply held that the petitioners in that case did not have a cause of action under the LMRDA because the protections of the LMRDA do not apply to union employees who have been terminated for political reasons. This holding has nothing to do with the instant case because Ardingo is not asserting a cause of action under the LMRDA. Instead, he is suing to enforce his state-law contract rights under his just-cause employment contract, and these contract rights simply are not impacted by *Finnegan*. It would be a non-sequitur to say that Ardingo is precluded from bringing a lawsuit to enforce his contract rights simply because the LMRDA does not provide him with a cause of action against the defendant. Indeed, there are many federal laws that do not provide Ardingo with a cause of action, but that does not mean that each one of them preempts his wrongful-discharge lawsuit. In short, when a union chooses to offer a just-cause employment contract to an employee, there is nothing in *Finnegan* or the LMRDA that would prevent that contract from being enforced.

The defendant erroneously believes that *Finnegan* is relevant to this case because the defendant misinterprets *Finnegan* as standing for the proposition that the LMRDA gives union officials unfettered discretion in employment matters. The holding of *Finnegan*, however, clearly does not support this interpretation. The fact that the LMRDA does not provide a cause of action to union employees who have been fired for political reasons does not mean that state law could never restrict a union leader's discretion to terminate a union employee. *See Bloom v. Gen. Truck Drivers, Office, Food & Warehouse Union, Local 952*, 783 F.2d 1356, 1360-62 (9th Cir. 1986)

10

(holding that a wrongful-discharge lawsuit was not preempted by the LMRDA where a business agent claimed to have been terminated for refusing to violate state law). Such a question was not even before the *Finnegan* Court. Therefore, it would be wrong to say that *Finnegan* stands for the proposition that the LMRDA gives union officials unlimited discretion in employment matters.

Finally, it is true that the defendant's just-cause policy allows employees to be terminated for political reasons along the lines discussed in *Finnegan*, but this is not a basis for finding preemption. Instead, this fact is only relevant to the issue of whether Ardingo's termination was a violation of the just-cause policy. The question of whether Ardingo was fired for just cause was a matter for the jury to decide, and the sufficiency of the evidence has not been challenged on appeal.

### III. Evidentiary Objections

At trial, Ardingo presented evidence that he had cooperated with a Department of Labor investigation and had testified before a grand jury, and he also presented evidence indicating that he was terminated in retaliation for these acts rather than for any just cause. The defendant objects to the admissibility of this evidence on the ground that it was irrelevant and prejudicial. This argument, however, lacks merit. All relevant evidence is admissible, Fed. R. Evid. 402, and relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," Fed. R. Evid. 401. In this case, the issue before the jury was whether Ardingo was terminated in violation of the defendant's just-cause policy. Thus, the reason for Ardingo's termination was a fact that was of consequence to the determination of the action. As result, any evidence bearing on the reason for Ardingo's termination would have been relevant and therefore generally admissible. Because the evidence of retaliation undeniably had some bearing on the reason

11

for Ardingo's termination, it was relevant and admissible.

The evidence was also relevant and admissible because it rebutted the union's defense that Ardingo was terminated out of economic necessity. Under Michigan law, economic necessity can constitute just cause for discharging an employee, *see Ewers v. Stroh Brewery Co.*, 443 N.W.2d 504 (Mich. Ct. App. 1989), but economic necessity cannot be used as a pretext "for discharges which would otherwise be subject to just-cause attack by the employee." *Id.* at 507. Therefore, Ardingo was entitled to present evidence showing that the purported economic necessity was just a pretext for termination without cause.

The defendant, however, contends that the evidence pertaining to retaliatory discharge was irrelevant and inadmissible because it had no bearing on the issue before the jury. According to the defendant, the only issue properly before the jury was the question of whether the defendant was in such dire financial straights that it terminated Ardingo out of economic necessity. Therefore, the defendant contends that the only evidence that was admissible at trial was evidence pertaining to the its financial circumstances. The defendant bases this argument on Judge Enslen's opinion denying the defendant's motion for summary judgment on the wrongful-discharge claim. From the defendant's viewpoint, Judge Enslen's opinion had the effect of definitively establishing that the only issue to be decided by the jury was the question of whether the defendant actually had an economic need to terminate Ardingo. Thus, according to the defendant, Ardingo was limited to presenting evidence on only that issue. This argument, however, is plainly wrong because it relies on a gross misreading of Judge Enslen's opinion. In denying the defendant's motion for summary judgment, Judge Enslen clearly did not limit the issues to be decided by the jury. *See* J.A. at 327-28. Instead, he simply found that the claim must be decided by a jury because the defendant's two

12

defenses to this claim did not demonstrate that the defendant was entitled to judgment as a matter of law. *See id.* Rather than intending to limit the issues, Judge Enlsen was simply responding to the two specific arguments raised by the defendant: (1) Ardingo was not terminated, but was merely laid off; and (2) Ardingo's layoff/termination was due to economic necessity. Judge Enslen found that there were genuine issues of material fact with respect to these defenses, but he did not hold that these were the *only* issues on which there were genuine issues of material fact. *See* J.A. at 327-28. A contrary holding would not only be factually wrong, but it would produce the absurd result of allowing a defendant to limit a plaintiff's evidence according to the issues that the defendant chose to raise in its motion for summary judgment.

The defendant also argues that the trial court should have excluded the retaliatory discharge evidence under Fed. R. Evid. 403 because that evidence was unfairly prejudicial. Rule 403 allows relevant evidence to be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." "Within the context of Rule 403, '[u]nfair prejudice does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather, it refers to evidence which tends to suggest [a] decision on an improper basis.'" *United States v. Lawson*, 535 F.3d 434, 442 (6th Cir. 2008) (quoting *United States v. Newsom*, 452 F.3d 593, 603 (6th Cir. 2006)). The evidence at issue here does not suggest a decision on an improper basis. Indeed, the trial court took appropriate measures to ensure that would not happen by preventing Ardingo and his witnesses from testifying about the substance of either the Government's investigation or the grand jury proceedings. *See, e.g.,* J.A. at 35-36, 725-26. Ardingo was permitted to reveal nothing other than the fact that there had been a Government

13

investigation with which he cooperated, that there had been a grand jury proceeding before which he testified, and that union officials reacted to these actions with hostility. *See id.* at 35-36. As this evidence was necessary for the presentation of Ardingo's theory of the case, and did not suggest a decision on an improper basis, it cannot be said that the trial court abused its discretion in admitting the evidence. *See United States v. Goosby*, 523 F.3d 632, 638 (6th Cir. 2008) (stating that evidentiary rulings are reviewed for abuse of discretion).

Finally, the defendant also asserts that the evidence of Ardingo's cooperation with the Government and testimony before a grand jury was not admissible because those acts were too temporally remote from his discharge to prove that the discharge was in retaliation for those acts. This argument, however, is misdirected. The lack of temporal proximity between Ardingo's termination and his cooperation with the Government and testimony before a grand jury might be valid basis for finding that the defendant was entitled to judgment as a matter of law, *see Aho v. Dep't of Corr.*, 688 N.W.2d 104, 110 (Mich. Ct. App. 2004), but it is not a valid basis for finding that the evidence of retaliation should have been excluded at trial. All that Rule 401 requires is that the evidence make Ardingo's case somewhat more or less likely, and there can be no doubt that the evidence at issue here had the effect of making his case somewhat more likely. The fact that the evidence may not have been enough to make Ardingo's claim more likely than not does not mean that it was irrelevant. In other words, the fact that a plaintiff's evidence fails to make the plaintiff's case likely enough for the plaintiff to win does not mean that the evidence fails to make the plaintiff's case more likely than it would have been without the evidence.

### IV. Jury Instructions

A trial court's refusal to give a requested jury instruction is reviewed for abuse of discretion,

14

and it constitutes reversible error if "(1) the omitted instruction is a correct statement of law, (2) the instruction is not substantially covered by other delivered charges, and (3) the failure to give the instruction impairs the requesting party's theory of the case." *Tompkin v. Philip Morris USA, Inc.*, 362 F.3d 882, 901 (6th Cir. 2004) (quoting *Hisrich v. Volvo Cars of N. Am., Inc.*, 226 F.3d 445, 449 (6th Cir. 2000)). "A judgment may be reversed only if the instructions, viewed as a whole, were confusing, misleading, or prejudicial." *Id.* (quoting *Hisrich*, 226 F.3d at 449). The defendant contends that the trial court committed reversible error by refusing to give the defendant's requested instructions with respect to: (1) the union president's right to terminate union employees for political reasons pursuant to *Finnegan*; (2) the burden of proof for a wrongful-discharge claim; and (3) the possibility that Ardingo could be reinstated rather than awarded front pay. However, because the district court's refusal to give these instructions was not an abuse of discretion, this court will not disturb the jury's verdict.

## A. The Defendant's Proposed *Finnegan* Instruction

The defendant requested that the trial court instruct the jury that because the just-cause policy incorporated *Finnegan*, it allowed employees to be terminated for political reasons. *See* J.A. at 342. The trial court provided such an instruction during trial, but declined to so instruct the jury at the close of evidence because the defendant had built its case around the theory that Ardingo was terminated for economic reasons, not political reasons. *See id.* at 39. Therefore, the trial court concluded that giving this instruction would only serve to confuse the jury. *See id.* While the trial court could have reminded the jury of its previous instruction at the close of evidence—and that may have even been preferable—the trial court did not abuse its discretion in refusing to give the instruction a second time, especially where it did not impair the defendant's theory of the case in any

15

way. *See Tompkin*, 362 F.3d at 901 (quoting *Hisrich*, 226 F.3d at 449).

The defendant's sole defense from the beginning to the end of this case was that Ardingo was terminated for economic reasons. The defendant's counsel clearly established this as the defendant's theory of the case when he announced in his opening statement that "We claim [Ardingo] was laid off due to economic and financial circumstances," J.A. at 569. The defendant's counsel continued to advance this theme throughout the trial and, to a large extent, focused its cross examinations and the testimony of its own witnesses on the issue of its economic circumstances. *See, e.g., id.* at 666-67, 978-92. Thus, it is clear that the defendant's theory of the case was that Ardingo was terminated because of economic necessity. As a result, the trial court did not impair the defendant's theory of the case by refusing to instruct the jury a second time that a union employee could be fired for political reasons. Accordingly, the refusal to give the defendant's requested *Finnegan* instruction did not impair the defendant's theory of the case and therefore cannot constitute reversible error. *See Tompkin*, 362 F.3d at 901 (quoting *Hisrich*, 226 F.3d at 449).

Moreover, the refusal to give the requested *Finnegan* instruction at the close of evidence did not render the jury instructions confusing or misleading with respect to the contours of the defendant's just-cause policy. To say otherwise would ignore the fact that the entire just-cause policy was admitted into evidence, J.A. 436-41, as well as the fact that the jury actually was instructed on the meaning of *Finnegan* and *Finnegan*'s significance within the just-cause policy, *id.* at 1006. The trial court's instruction on the meaning and significance of *Finnegan* occurred during Robert Potter's testimony on behalf of the defendant. Potter had been asked by the defendant's counsel to explain the defendant's just-cause policy to the jury, *id.* at 997-98, but when he started to explain the meaning of *Finnegan*, the judge immediately stopped him, *id.*, which was appropriate

16

in light of the fact that witnesses are not allowed to explain the applicable law to the jury, *see United States v. Safa*, 484 F.3d 818, 821 (6th Cir. 2007). In lieu of allowing Mr. Potter to testify on that issue, the trial court instructed the jurors on the meaning of *Finnegan* and further instructed them that the just-cause policy allowed employees to be fired for political reasons because it incorporated *Finnegan*. *See* J.A. at 1006. The jurors presumably remembered this instruction when it came time for their deliberations, and the defendant has not presented any evidence that they failed to understand the instruction when given. *See Girtman v. Lockhart*, 942 F.2d 468, 474 (8th Cir. 1991) (holding that defense attorney's failure to object to prosecutor's misstatement of the burden of proof during closing argument was not ineffective assistance of counsel since the jury was presumably capable of remembering the judge's instructions regardless of when those instructions were given). Given this presumption, and the fact that the jurors had the just-cause policy available to them as an exhibit, this court can only conclude that the final jury instructions did not confuse or mislead the jurors about what did and did not constitute just cause under the defendant's policy. As a result, it cannot be said that the trial court's refusal to give the requested *Finnegan* instruction prejudiced the defendant since it neither impaired the defendant's theory of the case nor confused or misled the jurors. Moreover, the defendant has not presented any evidence that the jury was in fact confused or the trial court's decision not to reiterate this instruction at closing left the jury with a misunderstanding of the law.

Having failed to present any such evidence of jury confusion, the defendant argues that the trial court's refusal to give the requested *Finnegan* instruction prevented it from fully developing its theory of the case. The defendant readily admits that it did not set forth the theory that Ardingo was fired for political reasons, but it claims that this fact should not have stopped the trial court from

17

delivering the proposed instruction because it was the trial court's fault that the defendant did not argue that Ardingo was terminated for political reasons. According to the defendant, it was not able to make the argument because the trial court prevented Robert Potter from testifying about the meaning of *Finnegan*. This argument is not compelling for two reasons. First, the defendant staked out its theory of the case in its opening statement, long before Potter ever took the stand. Second, the trial court's refusal to permit Potter from testifying about the meaning of *Finnegan* was proper as discussed above and did not in any way prevent the defendant from arguing or presenting evidence that Ardingo was fired for political reasons. To the contrary, the defendant's failure to offer such proof was simply the result of its own strategic decision to focus on the economic, rather than political, reasons for terminating Ardingo.

The defendant also argues that the failure to provide the requested *Finnegan* instruction at the close of evidence prevented the jury from properly evaluating whether Ardingo had proven that he was terminated without just cause. This argument, however, reverses the applicable burden of proof. Under Michigan law, a wrongful-discharge plaintiff does not have to disprove every potential basis for just cause. Instead, a wrongful-discharge plaintiff must prove nothing more than that: (1) he was terminated by the defendant; (2) he was performing the duties of his employment until the time of his termination; and (3) he suffered economic damages as a result of the termination. *See Rasch v. City of E. Jordan*, 367 N.W.2d 856, 858 (Mich. Ct. App. 1985). When these prima facie elements are satisfied, the burden shifts to the defendant to prove a basis for just cause. *See id*. If the defendant demonstrates that it had just cause to terminate the plaintiff, then the burden shifts back to the plaintiff to show that the reason set forth by the defendant was merely a pretext for terminating the plaintiff for a reason that did not constitute just cause. *See Toussaint v. Blue Cross*

18

*& Blue Shield of Mich.*, 292 N.W.2d 880, 896 (Mich. 1980); *Ewers v. Stroh Brewery Co.*, 443 N.W.2d 504, 507 (Mich. Ct. App. 1989). Thus, in light of this burden shifting analysis, it is clear that the only grounds for just cause that matter—at least as far as the jury is concerned—are those set forth by the defendant as the purported reasons for the termination. Here, the defendant clearly attempted to satisfy its burden of proving just cause by showing that Ardingo was terminated solely for economic reasons. Since the defendant never set forth the theory that Ardingo was terminated in whole or in part for political reasons, a second *Finnegan* instruction was not necessary.

B. The Defendant's Proposed Wrongful-Discharge Burden-of-Proof Instruction

The defendant proposed a wrongful-discharge burden-of-proof instruction that was substantially similar to the one the trial court provided. They both set forth the burden shifting analysis that is required for wrongful-termination claims under Michigan law, and they each instructed the jurors that they were not to substitute their own business judgment for that the of the defendant. The primary difference between the two instructions was that the defendant's proposed instruction provided additional direction on the issue of pretext. With respect to pretext, the instruction given to the jury simply said that the jurors should find for Ardingo if they concluded that the defendant's purported basis for just cause—i.e., economic necessity—was not the real reason that Ardingo was fired. The instruction requested by the defendant, however, added that the jurors could not find economic necessity to be a pretextual reason for Ardingo's termination if the defendant held an honest—albeit incorrect—belief that there was an economic need to terminate him.

The defendant's requested instruction is compelling at first glance, but upon deeper analysis, it becomes clear that it is an incorrect statement of law because it is logically inconsistent with the rest of the wrongful-discharge instructions. Under Michigan law, the question of pretext does not

19

arise until the defendant has demonstrated that there was just cause for the termination at issue. *See Toussaint*, 292 N.W.2d at 896; *Ewers*, 443 N.W.2d at 507. Since the purported basis for just cause was economic necessity in this case, that means that the jury could not have considered the issue of pretext unless it had first determined that the defendant had an economic need to terminate Ardingo. Herein lies the problem with the defendant's requested instruction; if the jury has already determined that an economic necessity exists, then it makes no sense to ask whether the defendant had an honest but incorrect belief in the existence of an economic necessity. A finding of economic necessity necessarily precludes a finding that the defendant had an honest but incorrect belief in the existence of an economic necessity because the two findings are manifestly inconsistent. In other words, if an economic necessity existed, then the defendant could not have had an incorrect belief that an economic necessity existed. Nevertheless, this is what the defendant's requested instruction invited the jury to find. In light of the logical inconsistency presented by that instruction, it is clear that the instruction was not an accurate statement of the law. Therefore, the trial court was correct to reject the instruction. *See Tompkin*, 362 F.3d at 901 (quoting *Hisrich*, 226 F.3d at 449).

C. The Defendant's Proposed Instruction on Front Pay and Reinstatement

The defendant requested that the jury be instructed that it should not award "front pay" damages if it determined that reinstatement of Ardingo to his previous job was possible. The trial court rejected this instruction because it concluded that reinstatement was not a feasible remedy. In evaluating the propriety of this refusal, one must keep in mind that the court—not the jury—orders reinstatement. It is the jury's job to determine the damages suffered by the plaintiff, and then the trial court has the discretion to order reinstatement in lieu of front pay if it finds reinstatement to be a more appropriate remedy. *See, e.g., Davis v. Combustion Eng'g*, 742 F.2d 916, 922 n.5 (6th Cir.

20

1984); *see also Stafford v. Elec. Data Sys. Corp.*, 741 F. Supp. 664, 665 (E.D. Mich. 1990) (holding that the availability or propriety of reinstatement is a matter for the court to decide because reinstatement is an equitable remedy). Therefore, it is not the jury's place to decide that the availability of reinstatement precludes the award of front pay damages. Here, the trial court appropriately determined that reinstatement was not a viable remedy since Ardingo had found another job and relocated to Washington state. *See Roush v. KFC Nat'l Mgmt. Co.*, 10 F.3d 392, 398 (6th Cir. 1993) (stating that reinstatement is not appropriate "where the plaintiff has found other work" (citing *Henry v. Lennox Indus.*, 768 F.2d 746, 753 (6th Cir. 1985))). Accordingly, the trial court did not abuse its discretion in refusing to instruct the jury on the possibility of reinstatement.

## V. The Plaintiff's Expert Witness

The defendant argues that the trial court erred by permitting the plaintiff's expert witness, Dr. Marvin DeVries, to testify. According to the defendant, Dr. DeVries should not have been allowed to testify because his final expert report was not disclosed in a timely fashion. The problem with this argument, however, is that the defendant did not object to Dr. DeVries' testimony at the time of trial. It is true that the defendant filed a motion in limine to exclude the final expert report, but that motion did not request that Dr. DeVries be prohibited from testifying. However, when the trial court heard oral argument on this motion, the defendant's counsel did suggest that the court should exclude Dr. DeVries' testimony as well as his report. The trial court agreed to exclude the report, but it explicitly deferred ruling on the admissibility of the testimony. With respect to the admissibility of Dr. DeVries' testimony, the trial court stated, "I am going to take up your motion in the context of objections to Mr. [sic] DeVries' testimony at the time he testifies," J.A. at 527, and "So that's my ruling, and I will take up any specific objections you have to his testimony at the time

21

of his testimony," *id.* at 528. Since those statements did not amount to an explicit and definitive ruling as to the admissibility of Dr. DeVries' testimony, the defendant was required to contemporaneously object to the testimony at trial in order to preserve the issue of its admissibility for appeal. *See Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 791-92 (6th Cir. 2002) (citing *United States v. Brawner*, 173 F.3d 966, 970 (6th Cir. 1999)). When Dr. DeVries took the stand to testify at the trial, however, the defendant failed to make any objections. Indeed, not only did the defendant's counsel fail to object, but he affirmatively consented to Dr. DeVries' expert testimony; when the plaintiff's counsel moved the court to accept Dr. DeVries as an expert witness in this case, the defendant's counsel responded, "No objection, your Honor." In light of the defendant's failure to make a contemporaneous objection to the testimony, the defendant cannot now claim that the admission of Dr. DeVries testimony was error. *See id.*; *see also* Fed. R. Evid. 103(a)(1) ("Error may not be predicated upon a ruling which admits . . . evidence unless a substantial right of the party is affected, and . . . a timely objection or motion to strike appears of record . . . .").

## VI. Remittitur

This court reviews a refusal to remit a verdict for abuse of discretion. *See Denhof v. City of Grand Rapids*, 494 F.3d 534, 548 (6th Cir. 2007). A trial court should not remit a verdict "unless it is (1) beyond the range supportable by proof; or (2) so excessive as to shock the conscience; or (3) the result of a mistake." *Gregory v. Shelby County, Tenn.*, 220 F.3d 433, 443 (6th Cir. 2000) (citing *Bickel v. Korean Air Lines Co., Ltd.*, 96 F.3d 151, 156 (6th Cir. 1996)). None of these situations exist in the case at hand. First, given that Ardingo's economic expert testified that Ardingo had suffered a total economic loss of $943,479, J.A. at 818-19, the jury verdict of $819,614 is well within the range supportable by proof. Second, the jury's award may be somewhat excessive, but it is not

so high as to shock the conscience. The trial court reached this same conclusion, and the trial court's decision in this regard is entitled to substantial deference because "the excessiveness of the verdict is primarily a 'matter . . . for the trial court which has the benefit of hearing the testimony and of observing the demeanor of the witnesses." *Slayton v. Ohio Dep't of Youth Servs.*, 206 F.3d 669, 679 (6th Cir. 2000) (quoting *Wilmington v. J.I. Case Co.*, 793 F.2d 909, 922 (8th Cir. 1986)); *see also Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 905 (6th Cir. 2004) ("We undertake a highly deferential review of the district court, which itself is sharply limited in its ability to remit a jury verdict."). The defendant's arguments in favor of remittitur do little more than emphasize the uncertain and speculative nature of Ardingo's damages, a fact that is almost certainly present to some degree in any case where front pay damages are available. Those arguments simply do not overcome the high degree of deference that is owed to the trial court's ruling, and therefore, this court will not second guess the trial court's conclusion that the jury award is not shocking to the conscience. Finally, there is no indication that the verdict was the result of mistake. To the contrary, the jury was given a clear picture of the extent of Ardingo's economic loss by the testimony of his expert witness and the defendant's effective cross examination of that witness. Thus, the jury's award must be upheld because it is not beyond the range supportable by proof, is not so excessive as to shock the conscience, and is not the result of a mistake. *See Gregory*, 220 F.3d at 443.

## VII. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.

23

**Kennedy, Circuit Judge, dissenting.**

Jury instructions exist to submit the case's issues to the jury so that it can decide the case in accordance with the applicable law. *See Morgan v. N.Y. Life Ins. Co.*, 559 F.3d 425, 434 (6th Cir. 2009). The Union employment policy here stated that it could terminate an employee for "fail[ure] to meet employment performance standards" or if "[t]he Union's needs will be furthered by said termination, particularly as construed by the Supreme Court in *Finnegan v. Leu* and its progeny." Ample evidence existed in the record for the jury to draw the conclusion that the Union terminated Ardingo in accordance with *Finnegan*. I conclude that the district court should have instructed the jury on the employment policy's *Finnegan* clause, as the Union requested, and for that reason, I respectfully dissent.

I.

In *Finnegan*, the Supreme Court held that former union employees employed by the union lacked a cause of action against their union under the LMRDA for terminations based on political opposition. 456 U.S. at 441-42 (reasoning, in part, that the LMRDA assures "the ability of an elected union president to select his own administrators [as] an integral part of ensuring a union administration's responsiveness to the mandate of the union election"). In view of the above, *Finnegan* occupies a central role in this appeal. Its scope is a question of federal statutory interpretation with regard to the LMRDA and the preemption question, and a question of state law as to the contractual provision's effect. I question the majority's determination that the LMRDA does not preempt this action based in state law. Preemption protects the "uniform national labor relations policy" enacted in the LMRDA. *See Vandeventer v. Local Union No. 513 of the Int'l Union of Operating Eng'rs*, 579 F.2d 1373, 1377-78 (8th Cir. 1978). However, I need not decide the

24

question, because even if I accept the majority's preemption argument and its concomitant interpretation of *Finnegan*, the Union nevertheless deserved a jury instruction on it under its employment policy.

II.

I agree with the majority's characterization of the applicable law as to Ardingo's underlying claim. *See* Maj. Op. at 18. The plaintiff has the burden of proving that he was living up to the contract and the terms of employment up to his termination. The burden then shifts to the defendant to show that the termination was legal. If the defendant makes this showing, the burden shifts back to the plaintiff to show that the proffered reason was mere pretext. Over the course of trial, the Union argued that it did not terminate Ardingo–it laid him off, and should the jury conclude that it did terminate Ardingo, economic necessity motivated the termination. Ardingo offered evidence that the Union terminated him; also, Ardingo presented two alternative, individually sufficient theories in response to Ardingo's purported termination for economic necessity: (1) the Union did not face financial circumstances necessitating a reduction in workforce; and (2) the Union fired him in retaliation for his participation in the Department of Labor investigation, as part of suspicion that he planned to run against Potter, and for political opposition generally. Ardingo's own testimony provided much of the evidence for the Union's requested jury instruction.

In *Harvey v. Hollenback*, 113 F.3d 639 (6th Cir. 1997), we explained that, "[i]n *Finnegan*, a newly elected union leader was able to fire appointed union officials who had campaigned against him because ultimately, he was expressing the will of the majority by selecting a staff that shared his views and could be trusted to faithfully execute and implement his policies." *Id.* at 643. A jury could have narrowly construed Ardingo's retaliation theory as termination for lack of political accord

25

with the Union administration. Rumors had swirled around the Union in early- to mid-2001 that Ardingo intended to run against Potter for President in the upcoming election, which built up animosity against Ardingo within Potter's administration. Later, Potter and his administration perceived that Potter volunteered information to the Department of Labor to undermine them politically. The jury might have concluded that the Union terminated Potter because he could not be trusted to faithfully execute Potter's policies to further the Union's needs.

Without a jury instruction on the meaning of *Finnegan*, the district court did not make the jury aware of the legality of this articulated ground for Ardingo's termination. Put differently, the district court did not adequately describe the case's applicable law to the jury such that it could come to an accurate verdict after applying its findings of fact to said applicable law.

III.

The majority is correct in pointing out that the Union largely relied upon economic necessity as the legal ground for Ardingo's termination. Maj. Op. at 16. I do not dispute that as a strategic matter, the Union appeared to have determined that presenting an extensive case on characterizing Ardingo's termination as political would weaken its primary defense that economic necessity motivated the firing. Nevertheless, the majority does not deny that the Union sought testimony from Potter on the meaning of the employment policy's *Finnegan* clause so as to get that issue before the jury. *Id.* at 16-17. It even does not deny that this represented an attempt by the Union to argue that the employment policy made legal a certain type of termination for political opposition. To the contrary, Ardingo himself presented ample evidence that the Union terminated him for political opposition upon which the jury could have concluded in the Union's favor on this ground.

In actual practice, a party's theory of the case is not monolithic. This case was complex and

26

took nearly a week to try. As a matter of strategy, the Union intoned loudly its economic necessity argument while whispering its political opposition theory. That fact alone does not eviscerate the Union's right under the policy to terminate Ardingo in accordance with *Finnegan*, nor its concomitant right to have the jury decide the case in accordance with the applicable law. *See Taylor v. Teco Barge Line, Inc.*, 517 F.3d 372, 387 (6th Cir. 2008) ("A party needs only a slim amount of evidence to support giving a jury instruction . . . .")

IV.

By denying the Union's request for an instruction on the policy's *Finnegan* clause, the district court, in essence, ruled that the Union's argument that it legally terminated Ardingo in accordance with said clause failed as a matter of law only for failure to *produce* sufficient evidence to support that conclusion, because plenty of evidence in the record, produced by Ardingo, suggested that the Union terminated him for his political opposition. The question then becomes: does Ardingo deserve summary disposition on this issue or should the district court have submitted it to the jury, simply because he, not the Union, produced the relevant evidence?

The theory of Ardingo's termination as political opposition could either fit into the legal framework given above as one of the Union's legal reasons for termination, or as one of Ardingo's showings of pretext. Either Ardingo refuted the Union's economic necessity rationale by arguing both lack of economic necessity and political-opposition termination, or the Union put forth economic necessity and political opposition as legal reasons for termination and Ardingo refuted both. No doubt the majority states correctly that the Union failed to produce evidence of political opposition, so that it did not put forth political opposition as a lawful ground for termination alongside its economic necessity argument. Ardingo, not the Union, injected political opposition

27

into the case to show pretext; the law burdens him with production on his theories of pretext. In short, a proffered "theory of the case" encompasses more than the evidence a party produces, particularly when the law tasks the opposing party with the burden of production.

The district court allowed the jury to decide whether economic necessity was a pretextual reason for Ardingo's termination because the Union actually terminated Ardingo in accordance with some other unlawful reason. To decide that issue is to decide that the Union had not terminated Ardingo in accordance with the *Finnegan* clause, a lawful grounds for termination. Ardingo put forth the larger issue of pretext that included the narrower issue of political opposition to support his position. Ardingo's entitlement to have his political opposition theory get before the jury to respond to the Union's economic necessity argument then implies the same for the Union's *Finnegan*-clause argument. Summary disposition of the *Finnegan*-clause issue in Ardingo's favor does not follow when ample evidence in the record existed, produced by Ardingo and gestured at by the Union, to conclude in the Union's favor.

V.

Abundant evidence of political opposition existed. The Union attempted to argue the theory that even if economic necessity was a pretextual reason for Ardingo's termination because the Union actually terminated him for political opposition, such a termination would be legal as well. The jury instructions were prejudicial.[2] For the foregoing reasons, the Union deserved a jury instruction on

---

[2]The majority argues that no prejudice existed because the district court admitted the just-cause policy into evidence and read the Supreme Court's holding in *Finnegan* to the jury during Potter's direct testimony. Maj. Op. at 16. This ignores that the district court gave the following jury instructions:

> In order for you to decide whether there was a good or just cause for the termination of plaintiff's employment under defendant's policy you must

28

*Finnegan*, and so, I would reverse the judgment of the district court and remand for a new trial.

---

determine whether defendant was actually in financial circumstances necessitating a reduction in its work force, and whether that circumstance was the actual reason for termination of plaintiff's employment.

If defendant was not in circumstances requiring a reduction in its work force or if that was not the actual reason for plaintiff's termination then there was not good or just cause for termination.

These instructions render the policy's *Finnegan* clause inoperative as far as the jury is concerned.