NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0263n.06

Nos. 24-1478/1503

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
May 27, 2025
KELLY L. STEPHENS, Clerk

GAYANN MILLER,

    Plaintiff-Appellee/Cross-Appellant,

v.

SUBURBAN MOBILITY AUTHORITY FOR REGIONAL TRANSPORTATION (SMART),

    Defendant-Appellant/Cross-Appellee.

)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

OPINION

Before: BOGGS, GRIFFIN, and NALBANDIAN, Circuit Judges.

GRIFFIN, Circuit Judge.

A jury concluded that defendant Suburban Mobility Authority for Regional Transportation (SMART) discriminated against plaintiff Gayann Miller on the basis of her race when it declined to promote her. Following trial, the district court awarded Miller attorney fees and costs—albeit less than she requested. SMART raises many issues on appeal, including the jury's liability finding, the introduction of certain evidence, the propriety of plaintiff's closing statements, the exclusion of an African American juror, and the reasonableness of the attorney-fee award. Miller cross appeals, contending that the district court should not have reduced her attorney-fee request. We affirm.

I.

We turn first to SMART's contention that the district court erred in denying its motion for judgment as a matter of law under Federal Rule of Civil Procedure 50 following the entry of the

jury's verdict against SMART on Miller's race-discrimination claims under federal and Michigan law. We find no error.

A.

Judgment as a matter of law following trial is appropriate where the jury "would not have a legally sufficient evidentiary basis to find for the [nonmoving] party." Fed. R. Civ. P. 50(a)(1). Courts must "review all of the evidence in the record" and "draw all reasonable inferences in favor of the nonmoving party." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). We "may not make credibility determinations or weigh the evidence." *Id.* Instead, we must "disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* at 151. "That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Id.* (internal quotation marks omitted). We review the district court's resolution of SMART's Rule 50 motion de novo. *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir. 2004).

B.

At trial, Miller prevailed on race-discrimination claims under both Title VII of the Civil Rights Act of 1964 and Michigan's Elliott-Larsen Civil Rights Act, which prohibit employers from discriminating against employees "because of" race. 42 U.S.C. § 2000e-2(a)(1); Mich. Comp. Laws § 37.2202(1)(a). We apply "the same evidentiary framework" to discrimination claims brought under each statute. *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 652 (6th Cir. 2012) (internal quotation marks omitted).

The traditional burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), "established an allocation of the burden of production and an order

for the presentation of proof in Title VII discriminatory-treatment cases." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993). Under this framework, a plaintiff must first establish by a preponderance of the evidence a prima facie case of discrimination. *Id.* In a race discrimination case, that requires proof that (i) she was a member of a protected class, (ii) she was qualified for the job to which she applied, (iii) she was rejected despite her qualifications, and (iv) she was treated differently from similarly situated employees who are not a member of her protected class. *McDonnell Douglas*, 411 U.S. at 802. If the plaintiff is successful, the burden shifts to the employer to offer a "legitimate, nondiscriminatory reason" for the adverse employment action. *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981) (internal quotation marks omitted). "This burden is one of production, not persuasion; it can involve no credibility assessment." *Reeves*, 530 U.S. at 142 (internal quotation marks omitted). If the employer meets its burden, the burden shifts back to the employee to prove that the employer's reason was pretextual. *Burdine*, 450 U.S. at 253.

*McDonnell Douglas* is an evidentiary tool relevant to summary judgment. *St. Mary's*, 509 U.S. at 506–07. But this appeal comes to us post-jury verdict, and *Reeves* instructs how to determine whether a plaintiff has carried her ultimate burden of persuasion. 530 U.S. at 142–43. Once the plaintiff offers admissible evidence to establish a prima facie case, and the employer, in turn, "offer[s] admissible evidence sufficient for the trier of fact to conclude" that the employer had a legitimate, nondiscriminatory reason for the adverse action, "the *McDonnell Douglas* framework—with its presumptions and burdens—disappear[s], and the sole remaining issue [becomes] discrimination *vel non*." *Id.* (internal quotation marks and citations omitted).

Still, that does not mean the prima facie case becomes irrelevant. Indeed, it remains essential to both evaluating a motion for judgment as a matter of law under Rule 50, and the

sufficiency of the evidence supporting a judgment on appeal. *See id.* at 148–49, 152. *Reeves* reiterates that when a party appeals a Rule 50 motion, the reviewing court must look at "the evidence supporting the [employee's] prima facie case and undermining [the employer's] nondiscriminatory explanation." *Id.* In other words, the prima facie case becomes part of a slightly different inquiry—that is, the inquiry proceeds "to a new level of specificity." *Aikens*, 460 U.S. at 715. Rather than looking at each prima facie element for its own sake, the strength or weakness of the proof now informs the larger question under Title VII: was the employee terminated because of a protected characteristic?

## C.

With this framework in mind, we turn to the facts supporting the jury's verdict. Miller has driven buses for SMART, the public bus authority serving suburban Detroit, since 2015. At issue is her 2019 application for promotion to one of two open road-supervisor positions. SMART ultimately promoted two African American individuals—Vernon Williams and Terri Brown— over Miller, who is Caucasian.

The promotion process for these positions consisted of a panel (composed of SMART managers, human-resources personnel, and the transportation director) conducting two rounds of interviews. The panel made decisions after discussing each candidate and agreeing—based on their subjective beliefs, such as whether the interviewee was "confident" or "articulate"—who would be best for the position. Notably, it did not rely on objective or uniform criteria to make its decision.

Miller satisfied the minimum qualifications for a road-supervisor position, so she received a first-round interview. But the interview panel did not advance her to the second round of interviews because, in its view, her performance was "hesitant" and "timid" and her interview

answers were "incorrect[]" and lacking in detail. For example, when asked what a road supervisor should do upon arriving at an accident involving multiple injured people, Miller answered that she would first check on the bus driver. SMART asserts that this incorrect answer disqualified Miller from the road-supervisor position—road supervisors apparently should first evaluate injured individuals.

That justification, contends Miller, was pretextual. Her theory of the case is that Carol Martin—her supervisor and a member of the interview panel—decided whom to promote and considered applicants' races to make the decision. The most damning evidence of discrimination came from Miller's coworker, Gerald Burns. He testified that some time before the promotion decision, Martin told him that a "white girl . . . would never get a position under her watch."[1]

In addition to Burns's direct evidence, several witnesses testified that SMART did not promote a single Caucasian driver while Martin worked there. Take, for example, Matt Kauppila's experience. Kauppila is a Caucasian bus driver and one of Miller's colleagues; he testified that he approached Martin around 2018 about applying for a master-trainer position. Although Kauppila met the minimum qualifications to apply, Martin told him that he should not bother applying because he would not get the position. Indeed, he applied and did not receive an interview. Vernon Williams, one of the people who was promoted ahead of Miller, received the master-trainer position despite having less experience than Kauppila. It was not until after Martin retired that Kauppila re-applied, was invited to interview, and received the promotion. Similarly, another Caucasian driver, Rick Sauer, applied seven times for a promotion and, under Martin's supervision, "was denied every time." Kauppila summarized that "it's sad because anyone during

---

[1]Although SMART argues that Martin's alleged prejudicial statement to Burns took place in 2020 or 2021, after the decision not to promote Miller was made, the evidence construed in Miller's favor indicates that Martin made the statement in 2019 before the promotion interview.

Carol Martin's watch, anyone who was promoted, was African American. Anyone who was denied, was white. I mean, it's just a fact."

Miller also introduced significant evidence that SMART promoted less-qualified candidates. Vernon Williams had only a little over a year of experience driving for SMART while Miller had worked at SMART for four years. The jury also heard that Williams was involved in several accidents, including hitting a public-transit streetcar, failing to report an accident, leaving an accident scene, and falling asleep at the wheel. These infractions were far more serious than Miller's—she once hit a mirror and clipped the back end of a car. Critically, Williams's accident history was absent from the file that Martin presented to the interview panel. And Terri Brown, the other African American individual promoted over Miller, allegedly "had a lot of issues with passengers" and "always tried to get out of work." Brown also had about a year less experience at SMART than Miller did. The jury therefore could have reasonably concluded that Williams and Brown were not the superior candidates.

Further evidence demonstrated that SMART's reason for promoting Williams over Miller was pretextual. Recall the apparently important accident-response question that Miller answered incorrectly during her interview. Williams also got it wrong: he stated he would "[t]ry to maneuver the situation and let them know I understand. I would take hold of the situation." Leeya Sutter, a human-resources representative, confirmed that Williams's answer to that question was incorrect and that his similar answers to other scenario-based questions were also inadequate. Nevertheless, the hiring panel indicated that Williams's answers were "strong" and "detailed."

Moreover, SMART asserted that it did not promote Miller because of several incidents of misconduct, such as urinating in a cup while driving a bus and failing to complete certain routes. But those incidents occurred after the 2019 promotion decision. The panel therefore could not

have factored those incidents into SMART's decision not to promote Miller—and, as the district court pointed out, SMART's notes from Miller's interview "did not contain any of these allegations." When an employer shifts its reasoning after the fact, a rational juror can use that "post-hoc" justification to find pretext. *See Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 513 (6th Cir. 2021).

Thus, we agree with the district court that a reasonable jury could find that SMART's nondiscriminatory reason for not promoting Miller was pretextual.

SMART's repeated assertions that Miller failed to establish an element of her prima facie case—that she was qualified for the position—does not change this conclusion. Whether Miller provided "evidence of an essential element of her prima facie case" is not "dispositive" when we review a district court's denial of a motion for judgment as a matter of law. *Gray v. Toshiba Am. Consumer Prods., Inc.*, 263 F.3d 595, 599 (6th Cir. 2001). Rather at this stage, if Miller were not qualified for the road-supervisor position, this would inform whether she had sustained her burden of showing SMART intentionally discriminated against her. *Noble*, 391 F.3d at 727–28 ("[T]he evidentiary underpinnings of a plaintiff's *prima facie* case are [not] irrelevant or insulated from examination by this court to aid its determination whether the evidence *in toto* is sufficient to support a finding of intentional discrimination.").

But SMART's argument fails on the facts. Miller had to show that she satisfied SMART's "*objective* qualifications." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 575 (6th Cir. 2003). This refers to the minimum, objective criteria—such as education, relevant experience, and skills—that informed who was given a first-round interview. *See id.* at 576. SMART concedes that Miller satisfied HR's "minimum qualifications" for the road-supervisor position because Miller received an interview.

SMART insists that Miller prove more. It claims Miller was not qualified because she lacked the "subjective" criteria necessary for a second interview. *Culver v. CCL Label, Inc.*, 455 F. App'x 625, 628 (6th Cir. 2012). In its view, she was not "qualified"—for Title VII purposes—because Miller was "timid," and based on her interview, she was "far from the most qualified applicant for the position." But she did not need to show that she was the *most* qualified person to establish her prima facie case. *See Burdine*, 450 U.S. at 253 (plaintiff's prima facie burden "is not onerous"). That there were allegedly more-qualified candidates competing for the position is relevant only to SMART's nondiscriminatory reason for its promotion decision. And as explained, there was overwhelming evidence of SMART's shifting justifications and pretext motivating its rejection of Miller's application. So even if others were *more* qualified, a jury could reasonably have determined that this did not undermine all the other circumstantial evidence put forward by Miller that her race prevented her promotion. At bottom, "our duty . . . is simply to determine whether [Miller] produced sufficient evidence to support the jury's finding of intentional discrimination." *Noble*, 391 F.3d at 721. She did.

## II.

The next issue on appeal concerns Gerald Burns's testimony. Recall that he was Miller's coworker who testified at trial that Martin told him that "a white girl . . . would never get a position under her watch." SMART asserts that the district court should not have permitted Burns to testify at trial due to discovery violations by plaintiff's counsel, and in turn, that the district court's decision to the contrary was so unfair that a new trial is warranted under Federal Rule of Civil Procedure 59. We disagree.

A.

Miller's attorney first deposed Burns virtually in May 2021. During that deposition, Burns disclaimed any knowledge of Martin holding racially biased views. But in a *de bene esse* deposition two years later in September 2023, Burns stated the opposite: he testified then that Martin told him—in the context of her hiring employees for the road-supervisor position—"I would never hire a white person under my watch." When asked to explain his prior lie, Burns testified that, at the time, he was nearing retirement and "didn't want to say anything that would jeopardize [his] job" or retirement benefits. He also stated that an attorney for SMART intentionally kicked his foot and tapped his knee during that line of questioning to get him to "shut up" and "be quiet."

Following this deposition, SMART moved for sanctions under Federal Rule of Civil Procedure 37 based on Miller's failure to disclose and supplement Burns's contradictory testimony. According to SMART, Miller's attorneys knew about this issue five months before noticing the *de bene esse* trial deposition but did not supplement plaintiff's Rule 26 disclosures. The district court initially declined to award sanctions, writing that "Burns's cancer treatments obviated the need for his *de bene esse* deposition and given his abrupt change in testimony—which plainly contradicts the testimony he gave in his discovery deposition—the Court finds that the untimely disclosure was substantially justified" under Rule 37(c)(1). But the district court adjourned trial and reopened discovery "for the limited purpose of determining the full scope of the reasons for Burns's change in testimony."

So SMART deposed Burns—now his third deposition—in November 2023. There, he gave contradictory testimony concerning the timing of who knew what and when. He first testified that when he sat for his *de bene esse* deposition, "no one" knew that he was going to change his

testimony, that he had informed Miller's attorney about having cancer just "prior" to that deposition, and that he first met with Miller's attorney the day of that deposition (but might have talked with him before via phone). But he later clarified—at the suggestion of Miller's attorney—that he recalled an interview with Miller's attorney (who said it occurred on April 5) to discuss his "testimony" and "diagnosis."

SMART again moved for sanctions. This time, the district court sided with SMART. It concluded that Miller "discovered in April 2023 that Burns would potentially be unavailable and that he was fundamentally changing his testimony" and "did not disclose this information until September 5, 2023, a month before trial was scheduled to commence." This conduct, the district court concluded, "was the result of gamesmanship, rather than any justifiable mistake." So, under Rule 37(c)(1), the district court found that "[p]laintiff's failure to supplement her disclosure of Burns as a witness [wa]s not substantially justified." It then struck Burns's deposition testimony and struck him from the witness list. So Burns would "not be permitted to testify at trial."

Miller moved for reconsideration. She claimed that Burns was now available to testify at trial (because he was no longer hospitalized for back surgery), thus obviating the need for a *de bene esse* deposition. After hearing more argument, the district court reversed its decision in an oral statement from the bench, anchoring its reconsideration on harmlessness grounds. While it initially prohibited Burns from testifying due to the discovery violation, the court found that the violation was "cured" by the subsequent deposition and his availability for trial.

Burns testified at trial and was subject to impeachment given his prior inconsistent statements—he expressly told the jury that he "lied" under oath during his first deposition when he did not reveal what Martin said to him. Following the jury's verdict, SMART moved for a new trial under Rule 59, arguing that the district court should not have allowed Burns to testify.

Specifically, it argued that Rule 37 mandated sanctions unless Miller established either harmlessness or substantial justification, and yet the district court excused compliance because it found that Burns was now available to testify. In denying SMART's motion for judgment as a matter for law, the district court concluded that there was a lack of prejudice on SMART's behalf because it "had a full opportunity to cross examine Burns at trial about his contradictory testimony and explore his credibility. . . . Moreover, the Court allowed Defendant an opportunity to re-depose Burns and adjourned the trial to give Defendant time to conduct Burns' third deposition."

B.

Rule 59 permits a district court to grant a new trial following a jury verdict "for any reason for which a new trial has heretofore been granted in an action at law in federal court." So Rule 59 warrants a new trial when the jury's result is "seriously erroneous." *Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 606 (6th Cir. 2018) (internal quotation marks omitted). For proof, we look to: "(1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, *i.e.*, the proceedings being influenced by prejudice or bias." *Id.* SMART bears the burden to establish prejudice. *See Tompkin v. Philip Morris USA, Inc.*, 362 F.3d 882, 891 (6th Cir. 2004). We review the district court's denial of SMART's Rule 59(a) motion for an abuse of discretion. *Pittington v. Great Smoky Mountain Lumberjack Feud, LLC*, 880 F.3d 791, 798–99 (6th Cir. 2018). An abuse of discretion occurs "if the district court relies on clearly erroneous findings of fact, applies the wrong legal standard, misapplies the correct legal standard when reaching a conclusion, or makes a clear error of judgment." *Id.* at 799 (internal quotation marks omitted).

The district court did not abuse its discretion by concluding that its decision allowing Burns to testify was not so unfair as to warrant a new trial. First, his statement about what Martin told

him was raised at trial during cross-examination of Miller's testimony. Martin was also asked about, and denied making, that statement during her testimony. So, regardless of whether Burns testified, the jury heard an inference as to Miller's best direct evidence of discrimination—Martin's racially prejudicial comment to Burns.

Second, SMART knew in advance of trial that Burns had flipped his testimony and so had time to prepare accordingly. It was twice able to cross-examine him during depositions, allowing it to probe Burns on his inconsistent statements to tee up impeachment during trial. And it did impeach Burns; so, the district court's orders concerning Burns helped SMART prepare its defense.

SMART pushes back, contending that the Federal Rules of Civil Procedure governing discovery—Rules 26 (disclosures) and 37 (sanctionable conduct)—required the district court to sanction Miller once it found her attorney's conduct rose to the level of "gamesmanship." But district courts have broad discretion when managing discovery issues, *RJ Control Consultants, Inc. v. Multiject, LLC*, 100 F.4th 659, 668–69 (6th Cir. 2024), and exclusion of tardily disclosed evidence is not mandatory, *Howe v. City of Akron*, 801 F.3d 718, 747 (6th Cir. 2015). Significantly, the district court's modification of the trial schedule and permitting an additional deposition of Burns "cure[d] the surprise." *Id.* at 748 (internal quotation marks omitted). In short, any discovery violation was harmless. Therefore, the district court did not abuse its discretion in concluding that Burns's testimony was not so unfair that a new trial was warranted under Rule 59. *See Meat Town Inc. v. Sentinel Ins.*, 852 F. App'x 925, 941–42 (6th Cir. 2021) (finding no abuse of discretion when a party failed to timely disclose witness affidavits because the district court modified its scheduling order to allow for additional depositions instead of striking testimony).

III.

SMART next argues that plaintiff's counsel made improper statements during his closing, warranting a new trial under Rule 59. It focuses on this comment concerning SMART's "process" for making the promotion decisions: "Then they talked about the design of this process . . . . This process is terrible. There's no notes of any decisions. There's no video of anything for you to look at." SMART objected, referencing the district court's prior dismissal at summary judgment of Miller's disparate-impact claims, which alleged SMART's decisional processes disparately impacted Caucasians. The district court overruled the objection and permitted plaintiff's attorney to continue:

> That makes it — and again, that process was terrible. I can't show you any documentation at all about the first round cuts. I can't show you any of the discussions. I can't show you video. I mean, in a public-funded entity that's got millions and millions of dollars in funding they could have done a lot better job of giving us actually what happened at the interviews.
>
> But what we know what happened at the interviews is that a buddy of one of the guys came in, a guy that he played high school sports with, and there was no recusal. There were no forms for anybody to sign indicating that they didn't know any of the applicants. There were no forms that anybody had to sign that they had all the evidence. And what we know is that they didn't have all the evidence about Vernon Williams who they hired for the job. And we know that because the [interview notes] clearly show[] that Vernon Williams' file was not the same as anybody else's file.

According to SMART, these words were "an unfettered cheap shot, unsupported by evidence, [that] denigrate[d] SMART and . . . suggest[ed] to the jury that not only was Plaintiff the 'victim' of a bad promotion process . . . but that SMART could afford to pay for a better process and by extension, could afford to pay Plaintiff for her perceived slights." For this reason, SMART argued, the jury's verdict should be set aside.

The district court considered and rejected this argument when it denied SMART's motion for judgment as a matter of law. It concluded that these comments were, at best, "isolated"; noted

that it twice instructed the jury "that the lawyers' statements, commentaries, and arguments are not evidence"; and, most importantly, found the argument to be proper: "[I]t was not error for Plaintiff to point out the lack of an objective process in making the promotion decision herein, as it is evidence of pretext. Here, a major aspect of Defendant's defense was its interview process."

We discern no abuse of discretion in this determination. *See Balsley v. LFP, Inc.*, 691 F.3d 747, 761 (6th Cir. 2012). The district court found the remarks proper given the relationship between Miller's pretextual claims and SMART's lack of an objective employment-decision process. SMART does not engage with this reasoning and thus has not preserved the issue for appeal—failing to "advance[] any sort of argument for the reversal of the district court[]," *Geboy v. Brigano*, 489 F.3d 752, 767 (6th Cir. 2007), or "cogent" claim that the district court got it wrong "constitutes abandonment," *Burley v. Gagacki*, 834 F.3d 606, 618 (6th Cir. 2016). Even if the remarks were improper, the district court instructed the jurors not to consider counsel's arguments as evidence, *see Mich. First Credit Union v. Cumis Ins. Soc'y, Inc.*, 641 F.3d 240, 249–50 (6th Cir. 2011), and the totality of the circumstances do not indicate "a reasonable probability" that the jury's verdict was influenced by the comments, *Jones v. Kent County*, 115 F.4th 504, 516 (6th Cir. 2024) (citation omitted). Indeed, SMART makes no effort to demonstrate jury influence. Thus, plaintiff's attorney's inconsequential closing remarks do not require a new trial.

IV.

Next, SMART takes issue with the district court's resolution of its contention that Miller pretextually struck the sole African American person from the jury pool. For this purported error, it again claims that a new trial is warranted.

"The Constitution forbids striking even a single prospective juror for a discriminatory purpose," *Flowers v. Mississippi*, 588 U.S. 284, 303 (2019), and this prohibition extends to civil

cases, *see Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 630 (1991). Under *Batson v. Kentucky*, 476 U.S. 79 (1986), courts conduct a three-step inquiry when evaluating an assertion that a party unlawfully used a peremptory strike for race-based reasons: (1) the opponent must establish a prima face case of discrimination; (2) the proponent must offer a race-neutral explanation for the strike; and (3) the district court must determine whether the proponent's neutral explanation was the actual reason or mere pretext for discrimination. *See id.* at 97–98. "The ultimate inquiry is whether the [proponent] was motivated in substantial part by discriminatory intent." *Flowers*, 588 U.S. at 303 (internal quotation marks omitted).

During voir dire, the district court polled potential jurors on their views of prejudice. In response, the juror in question stated, "Yes, I believe in some way[s] minorities can be prejudice[d] towards non-minorities." Miller used her second peremptory challenge on that prospective juror, explaining (after SMART objected under *Batson*) that there were multiple grounds warranting her dismissal: (1) the juror "had quite a pause," "pursed her lips," and "really had to think about" the prejudice question; (2) the juror "had been a victim of discrimination" when someone "called her the N-word"; (3) her "brother drove for SMART"; (4) she indicated that she "had some economic hardship" that would make jury duty challenging. Later, plaintiff's attorney elaborated that it was his "recollection [that] she's the only person that paused" and then said "well, sometimes" when answering the prejudice question.

The district court found SMART's objection to be without merit, concluding that this explanation satisfied plaintiff's burden to establish that it struck this juror for non-racial reasons. We evaluate SMART's objection to the district court's no-pretext determination for clear error. *See Snyder v. Louisiana*, 552 U.S. 472, 474 (2008).

SMART argues that "the only explanation Plaintiff's counsel could initially muster for his decision to use a peremptory challenge on [the juror at issue] was that she 'paused' before answering that she believed minorities could be prejudiced against non-minorities." But that assertion is plainly incorrect—plaintiff's attorney offered several race-neutral reasons for striking the juror. SMART also does not offer any argument concerning why the district court's rejection of its *Batson* challenge rises to the level of clear error, so this issue too is abandoned. *See Burley*, 834 F.3d at 618. So we need not consider SMART's new arguments raised for the first time in its reply. *See Bormuth v. County of Jackson*, 870 F.3d 494, 500 (6th Cir. 2017) (en banc).

V.

A.

The last issue on appeal, which is also subject to Miller's cross-appeal, concerns the district court's award of attorney fees and costs of $185,427.16.

An attorney fee award must be "reasonable." *Adcock-Ladd v. Sec'y of Treas.*, 227 F.3d 343, 349 (6th Cir. 2000) (internal quotation marks omitted). Courts use the "lodestar" method to calculate reasonable attorney fees. *Geier v. Sundquist*, 372 F.3d 784, 791 (6th Cir. 2004). This method has three steps. *See id.* First, a court multiplies a reasonable hourly rate for each attorney who represented the prevailing party by the number of hours that the particular attorney worked on the case. *Id.* This calculation creates a total amount of fees that each attorney generated. *Id.* Next, the court adds together those total amounts to get a grand total—the lodestar amount—of what it cost the prevailing party to win. *Id.* at 792. This amount then anchors the last step by giving the court a starting number, after which the court evaluates the case's unique aspects to determine whether to adjust the award. *Hensley v. Eckerhart*, 461 U.S. 424, 433–35 (1983).

A party seeking fees must justify the amount of its request. *Reed v. Rhodes*, 179 F.3d 453, 472 (6th Cir. 1999). This burden requires evidence of the number of hours each attorney reasonably worked and the appropriate hourly rate for that work. *Hensley*, 461 U.S. at 433. In the absence of such evidence, a district court may reduce the award. *Id.* We review the district court's attorney-fee award for abuse of discretion. *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 551 (6th Cir. 2008). A district court has the "superior understanding of the litigation," *Hensley*, 461 U.S. at 437, and thus its "exercise of discretion is entitled to substantial deference because the rationale for the award is predominately fact-driven," *Imwalle*, 515 F.3d at 551.

B.

Following the jury verdict, Miller sought $428,466.66 in fees and costs under 42 U.S.C. § 2000e5(k) and Mich. Comp. Laws § 37.2802. Two attorneys represented the bulk of that request: James Rasor asked for $259,110 (172.74 hours at $1,500/hour), and Amanda Washburn requested $78,975 (175.5 hours at $450/hour). Miller supported this request (and even asked for an "upward adjustment of the lodestar") not with a fee study on prevailing market rates, but rather by conclusively asserting that Rasor "is a 95th percentile lawyer who reliably nets multi-million-dollar verdicts," "prevailed at every critical stage of these proceedings," and "did an excellent job," and that the "case required an enormous amount of time to collect, organize, and present to the Court."

The district court granted Miller's fee and cost request but substantially reduced the final amount awarded. Several factors influenced the decision: (1) only one of Miller's three claims survived summary judgment; (2) the jury's verdict was "less than 5% of the total amount Plaintiff's counsel argued the jury should award"; (3) Miller failed to "provide any analysis of how [Rasor's] high hourly rate [wa]s consistent with the prevailing market rates"; (4) significant time billed by

two timekeepers (including Washburn) occurred when they were not licensed attorneys; and (5) many requested fees for support staff were "unreasonable and represent[ed] duplicative work." So the district court calculated the lodestar by reducing the hourly rate (and some hours) and awarded the following fee schedule instead:  James Rasor—$103,200 (172.74 hours at $600/hour); Amanda Washburn (pre-law license)—$6,700 (67 hours at $100/hour); Amanda Washburn (post-law license)—$27,066 (108 hours at $250/hour); among other attorneys, for a grand total of $185,427.16 in attorney fees and costs.

## C.

On appeal, SMART takes no issue with the rates charged or hours awarded.  Instead, SMART claims that the district court should not have awarded any fees because Miller obtained limited success.  But "[l]itigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing the fee.  The result is what matters." *DiLaura v. Township of Ann Arbor*, 471 F.3d 666, 672 (6th Cir. 2006) (citation omitted).  And here, Miller obtained a substantial result—a jury's finding that it racially discriminated against her and an award of several hundred thousand dollars.  There was no abuse of discretion by the district court in awarding *some* attorney fees to Miller.[2]

On cross-appeal, Miller challenges the district court's reduction of her fee request.  She mainly contends that the district court erroneously concluded that she had asked for a sum certain and thus the district court erred in concluding that she obtained only five percent of what she asked

---

[2]SMART also contends that the district court should have declined to award any fees because of plaintiff's counsel's discovery malfeasance connected with Burns's testimony discussed above.  But it offers no caselaw supporting the argument that a district court abuses its discretion in awarding fees in such a scenario.

for when stating that she had achieved only "limited success."[3] This bare assertion is not enough to overcome abuse-of-discretion review. The district court extensively discussed why the rates that Miller sought were out of line with prevailing market rates, and Miller does not challenge that reasoning.

Consider, for example, plaintiff's lead lawyer, James Rasor, who asked for an astounding $1,500 per hour. The district court found that Miller could not substantiate her claim that the rate was within "the range of local rates" and found that the rate in fact was the opposite. Yet, the court still awarded a considerable rate of $650 per hour, which is almost at the 95th percentile of employment-attorney rates. It similarly dissected Miller's conclusory rate assertions for other attorneys and legal professionals and noted several instances in which Miller tried to charge fees at attorney rates for non-attorneys. So, in calculating the lodestar, the court reduced Miller's requested rates across the board, leaving the pertinent hours intact, as set forth above. It then made no further adjustments. Because the district court provided a "clear explanation of its reasons for the fee award," including the "relationship between the amount of the fee awarded and the results obtained," *Hensley*, 461 U.S. at 437, we discern no abuse of discretion.

## VI.

For these reasons, we affirm the district court's judgment.

---

[3]Miller also asserts in conclusory fashion that the district court erroneously reduced the hourly rate for "skilled law clerks and paralegals." But she lacks any sufficient argument for why the district court erred in reducing the rates of these individuals, rendering it forfeited. *Burley*, 834 F.3d at 618.